Kent WEIGHTMAN and Matthew
McGowan, Appellants,

v.

The STATE of Texas.

Nos. 379–97 to 381–97.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 16, 1998.

622

Cathleen C. Herasimchuk, Houston, for appellant.

1. The crimes of which each appellant was convicted were committed before September 1, 1994, the effective date of the revised penal code. *See* Acts 1993, 73rd Leg., Ch. 900, § 1.18(b). Thus, all references to the penal code are to the

Dan McCrory, Asst. Dist. Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

*OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

BAIRD, Judge, delivered the unanimous opinion of the court.

Appellant, Kent Weightman, was charged with and convicted of nine counts of theft of trade secrets and two counts of commercial bribery. Tex. Penal Code Ann. §§ 31.05 and 32.43(c)(Vernon 1989).[1] Specifically, the indictments charged theft of machinery drawings. The trial judge sentenced Weightman to five years confinement for each count. On direct appeal, the Court of Appeals reversed six and affirmed three counts of theft of trade secrets and affirmed both counts of commercial bribery. *Weightman v. State*, Nos. 14–93–01094–CR; 14–93–01095–CR; 14–93–01096–CR; and 14–93–01097–CR, 1996 WL 718465 (Tex.App.-Houston [14th Dist] delivered December 12, 1996) (Not published).

Appellant, Matthew McGowan, was charged with and convicted of one count of theft of trade secrets, Tex. Penal Code Ann. § 31.05, and two counts of commercial bribery. *Id.* § 32.43(b). The trial judge assessed punishment at five years confinement for each count. The Court of Appeals affirmed McGowan's conviction for theft of trade secrets and reversed his convictions for commercial bribery.*McGowan v. State*, 938 S.W.2d 732 (Tex.App.-Houston [14th Dist.] 1996).

We granted review in each case to determine whether the Court of Appeals erred in holding the evidence sufficient to support appellants' conviction for theft of trade secrets.[2] We will review each case jointly and affirm.

code in effect at the time the crimes were committed.

2. We granted one ground of review for both appellants: "The Court of Appeals erred in holding that the evidence was sufficient to support

## I.

The two complainants, Elliott Turbomachine Company (Elliott) and Dresser–Rand Corporation (Dresser), are "original equipment manufacturers" who researched, developed, and manufactured equipment for the "rotating and centrifugal" industry. In February, 1990, Elliott contacted and ultimately employed a firm which specialized in trade secret theft investigations to look into suspected companies who possessed Elliott's technical drawings for purposes of manufacturing and selling replacement parts. The investigative firm conducted an undercover operation to probe Houston's replacement parts industry. As part of this operation, the firm established a "dummy" brokerage company to feign interest in purchasing replacement parts.

An undercover operative, representing herself as a broker for the "dummy" company, spoke with representatives of the targeted businesses. The investigation narrowed to Weightman's company, Rotating Services Incorporated. Dresser became a part of this investigation when it was discovered that one of its employees, McGowan, had been selling information to Weightman.

Weightman manufactured and sold replacement parts for Dresser and Elliott machinery to the undercover operative. The drawings used to manufacture the Dresser parts were procured from McGowan, a Dresser employee not authorized to release the drawings. In return, Weightman wired money to McGowan.

The drawings used to manufacture the Elliott parts came from aperture cards Weightman held in his possession without Elliott's knowledge or authorization.[3] Weightman transferred the Elliott and Dresser drawings and titled each new drawing with the logo of his (Weightman's) company, Rotating Services Incorporated. Weightman was convicted of theft of trade secrets on two Elliott drawings and one Dresser drawing. McGow-

an was convicted of theft of trade secrets for one Dresser drawing.

## II.

The statute prescribing the offense of theft of trade secrets, Tex. Penal Code Ann. § 31.05, provides:

(a) For purposes of this section:

"Article" means any object, material, device, or substance or any copy thereof, including a writing, recording, drawing, sample, specimen, prototype, model, photograph, microorganism, blueprint, or map.

"Copy" means a facsimile, replica, photograph, or other reproduction of an article or a note, drawing, or sketch made of or from an article.

"Representing" means describing, depicting, containing, constituting, reflecting, or recording.

"Trade secret" means the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value and *that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes* .

(b) A person commits an offense if, without the owner's effective consent, he knowingly:

(1) steals a trade secret;

(2) makes a copy of an article representing a trade secret; or

(3) communicates or transmits a trade secret.

(c) An offense under this section is a felony of the third degree.[4]

■ As stated in *Coit v. State,* 808 S.W.2d 473, 475 (Tex.Cr.App.1991), and repeated in *Boykin v. State,* 818 S.W.2d 782 (Tex.Cr.App. 1991), "[w]here the statute is clear and unambiguous, the Legislature must be understood

---

conviction for theft of trade secrets in Cause No. 635637."

**3.** An "aperture card" is a microfilm of a technical drawing which can be placed in a special machine and maximized into a work product.

**4.** All emphasis supplied unless otherwise indicated.

to mean what it has expressed, and it is not for the courts to add or subtract from a statute." However,

> ... [i]f the plain language of a statute would lead to absurd results, or if the language is not plain but rather ambiguous, then *and only then*, out of absolute necessity, is it constitutionally permissible for a court to consider, in arriving at a sensible interpretation, such *extra* textual factors as executive or administrative interpretations of the statute or legislative history.

*Boykin v. State,* 818 S.W.2d at 785–786 (emphasis in original). A plain reading of "trade secret" as defined in § 31.05 provides us with a three pronged analysis of the "article" involved:

> 1) must be whole or any part of any scientific or technical information, design, process, procedure, formula or improvement;
>
> 2) must be of value to the owner; and
>
> 3) the owner must have taken measures to prevent the article from becoming available to persons other than those selected by the owner to have access for limited purposes.

Very little interpretive caselaw or legislative history can be found in the criminal area of trade secret law.[5] *Schalk v. State,* 823 S.W.2d 633 (Tex.Cr.App.1991), is the seminal Texas case governing theft of trade secrets and outlines what the State must prove to sustain a conviction under § 31.05. Specifically, *Schalk* defined what constitutes the requisite "measures" an owner must take to maintain trade secret status of an "article." *Id.,* 823 S.W.2d at 637. The *Schalk* Court further analyzed the amount of measures neces-

sary "to prevent [the article] from becoming available to persons other than those selected by the owner to have access for limited purposes." § 31.05.

In *Schalk,* the trade secret inquiry concerned custom-made computer programs. The Court identified the following security measures taken to protect the trade secret status of the subject computer programs: 1) employment agreements; 2) strict plant scrutiny; 3) restricted computer access; 4) nonauthorization of disclosure of subject programs; and, 4) general nondisclosure of the programs by the company and its employees. The Court held the *combination* of these measures was sufficient to qualify as "measures" under the statute to protect the trade secret status. *Ibid.*

### III.

Appellants assert the evidence is insufficient to support their convictions for theft of trade secrets because the State failed to prove beyond a reasonable doubt the three drawings at issue and information in those drawings contained were "secret." To conduct a legal sufficiency review, we follow the standard prescribed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[6] We view the evidence "in a light most favorable to the verdict" and ask whether "any rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt." *Earhart v. State,* 823 S.W.2d 607, 616 (Tex.Cr.App. 1991) (*citing Jackson,* 443 U.S. at 319 n. 12, 99 S.Ct. 2781).

■ Appellants argue the security "measures" Elliott and Dresser used were not in

---

**5.** Trade secret law has its origins in the civil law arena. *See BPI Systems, Inc. v. Leith,* 532 F.Supp. 208 (W.D.Tex.1981) (Fifth Circuit cases applying Texas law utilizing the trade secrets definition from the Restatement of Torts, citing *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 776 (1958)). The definition in the Restatement of Torts, § 757 reads in pertinent part:

> b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of

manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers....

**6.** At the time appellants filed this appeal, this Court had not determined whether the intermediate courts of appeals of this state could conduct a factual sufficiency review of the evidence supporting a conviction. This Court authorized such a review in *Clewis v. State,* 922 S.W.2d 126 (Tex.Cr.App.1996). The Court of Appeals declined, as does this Court today, to conduct a factual sufficiency review in this instance because appellants did not request such a review.

place at the time the drawings were created; thus, the trade secret status had been lost.[7] Further, appellants claim since the parts themselves are widely reproduced, the information contained within the drawings of those parts is no longer secret. In response, the State contends both companies, Elliott and Dresser, secured their drawings and maintained their trade secret status as evidenced by the measures articulated in *Schalk, supra.* Therefore, the third prong of the definition of "trade secret" is at issue: whether the owner has taken measures to prevent the article from becoming available to persons other than those selected by the owner to have access for limited purposes. § 31.05.

■ "It is axiomatic that the core element of a trade secret must be that it remain a secret. However, absolute secrecy is not required." [8] *Schalk,* 823 S.W.2d at 641 (citation omitted). The Court of Appeals adopted the *Schalk* criteria to illustrate the measures taken by the owners to ensure the trade secret status of the drawings.[9] In accordance with *Schalk,* the Court of Appeals found the following combination of "measures" to be sufficient in meeting the definition of trade secrets under section 31.05(a) of the Texas Penal Code:

A: Employee Non–Disclosure Agreements

B: Plant Security

C: Access to Information

D: Other Measures

We will also accept these measures and employ them in our analysis. We begin our analysis with the most important illustration of security measures taken.

### A.

### Employee Non-disclosure Agreements

■ As stated in *Schalk,* employment contracts containing nondisclosure agreements are common in trade secret law. *Id.* at 640. *See also Aries Information Systems, Inc. v. Pacific Management Systems Corp.,* 366 N.W.2d 366 (Minn.App.1985)(In suit for misappropriation of trade secret, employees signed an "Employee Confidential Information Agreement" which the court considered to be a reasonable effort to maintain the secrecy of computer software). Such agreements create a fiduciary duty that prohibits employees from disclosing trade secrets or proprietary information. *Schalk,* 823 S.W.2d at 640. Both Dresser and Elliott used employee nondisclosure confidentiality agree-

---

7. Appellants raise an important issue of whether the statute requires the measures be in place at the time of the article's inception. While a valid question, it is not an appropriate issue for this Court to address. This issue must be resolved by the legislature. Our position as the judiciary is to effectuate the intent of the legislature and apply the plain meaning of the statute. *Boykin v. State,* 818 S.W.2d at 785. "[H]as taken measures" as expressed by the statute does not require that the measures be in place at the time the article was created. A fair reading of the statute purports to mean that the measures be in place at the time the article was stolen, copied, communicated or transmitted. *See* § 31.05.

8. Although not dispositive, civil courts have examined this issue and held the same. *See Furr's Inc. v. United Specialty Advertising Co.,* 338 S.W.2d 762, 765–766 (Tex.Civ.App.-El Paso 1960, writ ref'd n.r.e.) (Affirmative steps must be taken to preserve the secrecy of the information); *Metallurgical Industries Inc. v. Fourtek, Inc.,* 790 F.2d 1195 (5th Cir.1986) (applying Texas law) (Evidence of extensive efforts to maintain secrecy is probative that the information itself is a trade

secret); *Elcor Chemical Corp. v. Agri–Sul, Inc.,* 494 S.W.2d 204, 212–213 (Tex.Civ.App.-Dallas 1973, writ ref'd n.r.e.) (It is not a defense then that one could have developed the trade secret by legitimate means, given enough time and money).

9. Appellants urge the Court to expand its decision in *Schalk v. State,* 823 S.W.2d 633 (Tex.Cr. App.1991). Specifically, appellants' proposed issue was:

Can a person be convicted for Theft of Trade Secrets when the State has failed to prove, beyond a reasonable doubt, that the measures that are *currently* taken to protect an owner's information had been in place and effective for the entire 12 to 15 years that the information existed, particularly when numerous other competitors sell replicas of the parts now claimed to be 'secret.'

*Schalk* established the requisite guidelines for courts in interpreting "measures;" therefore, we decline to accept appellants' argument and will address the issue *sub judice* according to the statute and *Schalk.*

ments as a measure of securing their trade secret drawings.[10]

At the time of trial, Eugene Holler had been an engineer with Dresser since 1959.[11] He testified employees have always been required to sign a "Conflict of Interest" agreement.[12] Appellant McGowan, as an employee of Dresser, signed this document which states as follows:

> ... During my employment and thereafter, I shall keep secret and confidential and not disclose to any unauthorized person, any secret or confidential information of the COMPANY that I obtain as a result of or during my employment.(SF 38–41)

Similarly, Ross Hackel, an engineer with Elliott since its merger with Carrier Corporation in 1957, testified all full-time employees are required to sign an "Employment and Patent" agreement. That particular agreement states:

> ... I agree to keep secret all confidential information of the Company, and agree not to disclose it to anyone outside the Company either during or after my employment with the Company, except upon written consent of the Company.

All hourly Elliott employees are required to sign a document called "Plant Rules" which forbids employees from removing or misusing any confidential information or expect immediate discharge. Further, a form entitled "Proprietary Information, Release Thereof" which comes out of Elliott's employee manual is distributed to company employees and reminds them not to distribute drawings and technical information outside the company.

Weightman contends these employee nondisclosure agreements are inapplicable in this case because he was not an employee of either company. Nonetheless, the record reflects Weightman obtained one of the drawings from McGowan, a Dresser employee. *Schalk* explains these confidentiality agreements are relevant evidence of the owners' attempts to secure the drawings from disclosure. *Schalk*, 823 S.W.2d at 640, (stating a nondisclosure agreement is *evidence* of the employee's fiduciary duty not to disclose trade secret or proprietary information to anyone not so designated by the company.)

## B.

### Plant Security

■ Appellants do not dispute the adequacy of the *current* security measures employed by both Dresser and Elliott in the facilities that house trade secret documents. Appellants, however, maintain there is no evidence these measures were in place when the drawings were created, or that the drawings were trade secrets at the time of their creation.[13] Section 31.05(a) provides owners must only have taken measures to prevent

10. Appellants claim Dale Thibodeau, a Dresser employee, testified this particular agreement did not address the use of technical drawings. (SF V. I 10). However, after reviewing the record, Thibodeau was testifying as to a confidential agreement with Ingersoll Rand who merged with Dresser–Clark. The drawing that is the object of the prosecution was not created by Ingersoll Rand but by Dresser–Clark, so appellant's contention was misplaced.

11. Appellants assert that Holler did not work for Ingersoll Rand before the 1987 merger with Dresser and, therefore, could not offer any evidence of Ingersoll Rand's security measures. But under § 31.05(a), the appropriate inquiry is whether the respective companies "ha[ve] taken measures to prevent [the articles] from becoming available to persons other than those selected by the owner to have access for limited purposes." See also fn. 7 *supra*. Ingersoll Rand's pre-merger security measures are irrelevant because the Dresser drawing made subject of this prosecution was created by Dresser–Clark, not Ingersoll Rand. Thus, only Dresser–Clark pre-merger security measures would be relevant and Kathleen Driscoll testified as to those matters.

12. Since the incident in question, Dresser employees have been required to sign a "code of conduct" document which addresses employee behavior inside and outside the company parameters. Employees re-sign the agreement every three years. This document was created on November 22, 1988; however, it is not clear from the record whether this was in place at the time appellants first confiscated the Dresser drawing.

13. Weightman maintains the drawings are not secret because companies other than Elliott and Dresser created them. More specifically, appellant claims all Elliott drawings were labeled: "Purchased from Western Gear Corporation." Upon review of the record, the two Elliott drawings in question only contain the Elliott logo and evidence was offered to support that notion.

the article from becoming available to unauthorized entities.

The record reflects both companies provided plant security to protect trade secret documents during the time period in which the trade secret was allegedly lost. Eugene Holler, Kathleen Driscoll, and Dale Thibodeau, all long-time employees of Dresser and its predecessors, testified drawings were kept under lock and key subject to limited access by persons designated by job description to receive such information. Kathleen Driscoll stated Dresser employed security guards, video cameras, and access cards in the plants where drawings were stored. Likewise, Ross Hackel, who has been with Elliott since its development of technical drawings, confirmed security measures have always been in place to secure the drawings from unauthorized persons. The record reflects both companies have guarded entrance gates, and visitors are escorted by security personnel while on premises. No visitors are allowed in the area where the drawings are stored.

Similarly, Ross Hackel testified employees were issued identification badges and allowed only limited access to drawings. Ross Hackel further testified Elliott relied on the integrity of its employees within the service area to maintain plant security. Appellants claim the Dresser drawing does not contain a stamp either labeling it as secret or confidential. This argument is to refute Kathleen Driscoll's assertion that all Dresser trade secret documents have been stamped since 1969. However, evidence was presented by Eugene Holler who explained an absent stamp may only indicate that the drawing was obtained illegally.

We find persuasive the position taken in *K & G Oil Tool v. G & G Fishing Tool Service*, 158 Tex. 594, 314 S.W.2d 782, 788 (1958)(*citing* Nims, Unfair Competition and Trade Marks, Sec. 148), where the Court held:

> . . . The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means.

Appellants further contend plant security measures were ineffective because Dresser and Elliott parts were widely available in the secondary market. As evidence of the availability of replicated Elliott and Dresser parts, appellants point to a 1986 Marchem Company loose-leaf binder listing Elliott and Dresser part numbers with their correlative Marchem part numbers, and Weightman's possession of several thousand old Elliott aperture cards. The record does not show any evidence the three drawings at issue are available on the secondary market.[14] Weightman also argues that McGowan, an unauthorized employee at the time, should not have been able to access drawings if the measures to secure them were effective. Eugene Holler testified as to the strict access to the Dresser "drawing" room. Moreover, McGowan no longer had access to this type of technical information. Evidence was presented to show that McGowan misrepresented his intentions and purpose for the drawings and used his knowledge of the security measures to his benefit. Further, McGowan *was* authorized to service clients in his region, which he claimed at the time was his intention.

■ As for Elliott, the record further indicates only designated Elliott employees, such as Weightman's father, had access to Elliott aperture cards.[15] Moreover, aperture cards, unlike drawings, were generally not sent to third part vendors. Elliott never sold aperture cards to appellant nor authorized appellant to use the cards in any way. One can discover another's process lawfully by reverse-engineering or independent research, but it still does not lose its trade secret status if a substantial amount of secrecy is maintained. *Leonard v. State*, 767 S.W.2d 171, 175 (Tex.App.-Dallas 1988), *aff'd sub. nom. Schalk v. State*, 823 S.W.2d 633 (Tex.

---

**14.** Appellants did introduce evidence similar part numbers were in other company brochures. However, no evidence was presented as to whether these parts are the same or whether they were bought in bulk, reverse-engineered or removed illegally. Further, the drawings and information contained therein represent the trade secret, not the part.

**15.** Weightman's father, Paul, was an employee of Elliott from the 1940's until 1987.

Cr.App.1991), *cert. denied,* 503 U.S. 1006, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992). In the civil case of *E.I. du Pont de Nemours v. Christopher,* the court acknowledged it is improper "to obtain knowledge of a process without spending the time and money to discover it independently . . . unless the holder voluntarily discloses it or fails to take reasonable precautions to ensure its secrecy." 431 F.2d 1012, 1015–1016 (5th Cir. 1970); *see also Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 901 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.).

## C.

### Access to Information

■ Another pertinent inquiry is whether these three drawings and information contained therein were available to anyone on the open market. As stated before, it is axiomatic the core element of a trade secret is it remain a secret. *Schalk* 823 S.W.2d at 640; *see generally* Tex.Jur.3d § 36 and cases cited therein. Absolute secrecy, however, is not required. *Id.* at 640. *See Q–Co Industries, Inc. v. Hoffman,* 625 F.Supp. 608 (S.D.N.Y.1985) (absolute secrecy not required, rather a substantial element of secrecy must exist). In *Schalk,* we analyzed whether the trade secret status of a computer software program was destroyed because the company encouraged disclosure of information regarding the program for educational purposes. *Schalk,* 823 S.W.2d at 640. The Court found limited disclosure to the public insufficient to permit an understanding of the design and architecture of the program. *Id.* at 642; *see generally Dickerman Assoc., Inc. v. Tiverton Bottled Gas Co.,* 594 F.Supp. 30 (D.C.Mass.1984).

■ In the instant case, appellants rely heavily on the fact other companies have the drawings because Elliott and Dresser "frequently disseminated copies of their drawings to vendors, suppliers, and customers long before they ever used any notations on the drawings indicating that they were trade secrets."[16] The size of the companies and the amount of drawings each has are not the relevant inquiry. Evidence was offered that vendors chosen to make these replacement parts were under a confidentiality agreement with the respective company.[17] Eugene Holler testified approximately only a dozen third-party vendors handle Dresser's trade secret information. Likewise, Ross Hackel testified Elliott too employs confidentiality agreements with third-party vendors, which require the vendor to limit employee access to the drawing or using it for any purpose other than that authorized by Elliott. A limited disclosure to others pledged to secrecy will not destroy the trade secret's status. *Leonard v. State,* 767 S.W.2d at 175. Further, the record reflects neither the drawings at issue were available on the secondary market nor the parts themselves were reverse engineered. Thus, sufficient evidence was offered to show the parties who had the drawings were ". . . those selected by the owner." § 31.05(a).

## D.

### Other Measures

■ Weightman also asserts two of the drawings, the Elliott drawing of an impeller seal and the Elliott drawing of a governor valve cover, are "assembly" drawings and do not meet the definition of "trade secret." However, the statutory definition does not make an exception for "assembly" drawings. Ross Hackel testified the impeller seal is a part for a centrifugal compressor and can be

---

16. Weightman's clandestine handling of these three drawings are evidence of the fact they were not readily available in the open market. Weightman obtained the Dresser drawing from an employee, namely McGowan, and Elliott aperture cards from his father, a prior Elliott employee.

17. Since the precedent in this area is limited, we may look to other jurisdictions for guidance. In *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 273 N.E.2d 393, 396 (1971), a civil trade secret case with similar facts, the court reasoned disclosure of trade secret information, or any part of it, to a customer or to a supplier of a component part when necessary for a business purpose did not necessarily destroy the confidential or secret nature of it. The court noted not all of the critical information was supplied and the recipients of such information understood that the information they received was to be treated in confidence.

manufactured in different sizes as reflected in the drawing. He further testified this is a high-tech part and would be difficult to reverse engineer. Contrary to appellant's claims, the record does not indicate these two drawings were ever released to the customer.

## IV.

In conducting a legal sufficiency analysis, we have determined by viewing the evidence in a light most favorable to the verdict, a rational trier of fact could conclude Dresser and Elliott maintained substantial secrecy of their trade secret drawings at issue. Appellants neither requested nor received permission to copy, communicate or transmit the drawings of the replacement parts. The unauthorized copying, communicating and transmitting of an article representing a trade secret constitutes an offense under § 31.05(b). Appellants' grounds for review are overruled.

The judgments of the Court of Appeals are affirmed.