Johnathan Deluna v. State
















IN THE
TENTH COURT OF APPEALS
 

No. 10-98-290-CR

     JOHNATHAN DELUNA,
                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                              Appellee
 

From the 40th District Court
Ellis County, Texas
Trial Court # 22844CR
                                                                                                                

O P I N I O N
                                                                                                                
  
      Jonathan DeLuna was convicted of capital murder. See Tex. Pen. Code Ann. § 19.03(a)(2)
(Vernon 1994). The State did not seek the death penalty, and he was sentenced to life
imprisonment. He asserts on appeal that the evidence is insufficient to support his conviction and
that the court erred in denying his request for a lesser-included instruction on the offense of
murder. Finding that a lesser-included offense instruction should have been given, we will reverse
the judgment and remand this cause for a new trial.
 
FACTS
      On November 7, 1996, Mark Smith was shot and killed in his home in Waxahachie. Smith
lived in a trailer next door to his brother and sister-in-law, Rodger and Patricia. Earlier that day,
Smith had asked to borrow Rodger’s truck. Rodger agreed, and Smith took the truck to
Corsicana. Rodger and Patricia took a different car to Dallas for the afternoon. Around 6:45 that
evening, when Rodger and Patricia returned home, they noticed that the truck Smith had borrowed
had been returned and that Smith’s own custom-painted truck was gone.


 They also noticed that
the doors to Smith’s trailer were open. Concerned, Rodger went to see if Smith was home and
found him lying on the kitchen floor.
      Rodger called the police. An investigation revealed that Smith had been shot with a nine
millimeter pistol. Drugs and paraphernalia were also found at the scene. The police questioned
neighbors and discovered that an unfamiliar car had been seen at Smith’s trailer. Eyewitnesses
stated that a black male and a Hispanic male were in the car. Although no one saw them take
Smith’s custom truck, it and the unidentified car were gone shortly thereafter. Rodger told the
police that Smith owed money to DeLuna, and that he had witnessed trouble between Smith and
DeLuna before. DeLuna then became a suspect in the crime.
      The police went to DeLuna’s house in Dallas and saw him get into a truck (not Smith’s)
driven by a “big white man.” The officers followed the truck for a short distance, but lost it at
the first main intersection. Around 9:00 the next morning, Smith’s custom truck was found in a
ditch in Dallas.
      The police made a photographic lineup containing DeLuna’s photograph and showed it to
witnesses at the trailer park. Some witnesses identified DeLuna as the Hispanic male seen at
Smith’s home. Others did not. Based on this evidence, DeLuna was arrested and charged with
capital murder.
THE EVIDENCE
Because DeLuna raises sufficiency issues, we will review the evidence in some detail.
Rodger Smith
      Rodger testified that on November 7, Smith asked to borrow his truck to go to Corsicana. 
According to Rodger, Smith left in the borrowed truck around 2:00 in the afternoon. Rodger
testified that he and Patricia left their home around 2:40, went to Dallas, and returned between
6:45 and 6:50 in the evening. He said he noticed his truck sitting in the driveway and noticed that
Smith’s truck was gone. He thought that Smith had returned, switched vehicles, and left again. 
However, Rodger could see that the doors to Smith’s trailer were open and lights were on. 
Rodger testified that he became concerned, ran over to Smith’s trailer, and discovered Smith lying
dead on the kitchen floor. He then called 9-1-1.
Russell Poynor
      Russell Poynor is an officer with the Waxahachie Police Department. He responded to the
9-1-1 call made by Rodger. Poynor testified that he concluded that Smith was dead from gunshot
wounds and then called Lieutenant Billie Wiggins and informed her of Smith’s death. Around that
time Officer Craig Holt arrived. Holt remained outside talking with witnesses while Poynor
searched the trailer. Wiggins then arrived and the scene was “taped off” until an officer with the
Criminal Investigations Division (CID) of the police department could investigate. Poynor
testified that Officer Ronald Turbeville with CID arrived shortly thereafter, ending Poynor’s
involvement. 
Ronald Turbeville
      Ronald Turbeville testified that he and Detective Larry Ball took photographs, but waited for
the arrival of the Dallas police before touching any evidence or “processing” the scene. He
identified many photographs of the scene and of contraband, which were admitted into evidence. 
Turbeville testified that Detective Mark Christian with the Waxahachie Police Department and two
Dallas officers processed the scene. He said he took statements from Melissa Otto, who was one
of Smith’s neighbors, and Travondalyn Wright, another potential witness. Turbeville also took
a statement from Rodger that night. Turbeville testified that he did nothing further on the night
of November 7 regarding this crime. He did, however, later subpoena the cellular phone records
of DeLuna and Billy Romines. He also showed a photo lineup to Wright, who identified DeLuna
as the Hispanic male she saw at Smith’s house.
      Turbeville testified that he later arrested DeLuna. At the time of the arrest, DeLuna was
wearing a pair of blue jeans and no other clothing. He had $3,600 in cash.
Jack Stalder
      Jack Stalder is employed with Southwestern Bell Wireless as a custodian of records. He
testified to receiving a subpoena for DeLuna’s and Romines’ cellular phone records. He prepared
records from October 25 through December 19 of 1996, which show multiple phone calls from
DeLuna to Romines on the night of the murder.
Charles Odom
      Charles Odom, a medical examiner with the Dallas County Medical Examiner’s office,
testified that he performed an autopsy on Smith’s body. He testified that Smith received five
gunshot wounds, two of which were lethal and resulted in his death. Odom also found high levels
of drugs in Smith’s body and said Smith could not have been functioning normally at the time of
his death.
      On cross-examination, Odom testified that when Smith was brought to the Medical
Examiner’s office, he was wearing a ring, a watch, and had a wallet with money in it in his jeans.
Mark Christian
      Mark Christian testified that he helped with the crime-scene investigation. He took
photographs, found bullets, and took steps to preserve evidence which might have been on Smith’s
body. Christian said that Officer Larry Ball collected shell casings from the scene. Christian also
discovered a notepad in the home with various telephone numbers on it.
Melissa Otto
      Melissa Otto lived in the Pine Meadows trailer Park on November 7, 1996. She was
approximately fourteen years old at the time. Otto testified that she rode the bus to and from
school, and that it usually dropped her off at the trailer park around 4:00 in the afternoon. She
testified that after the bus dropped her off on November 7, she went into her home, grabbed a
snack, and then returned outside. Otto said that she then went for a walk, and while walking back
toward her home, saw a car that she did not recognize pull up to the trailer “that had a nice truck
and a guy that lived there.” She testified that it was approximately 4:30 in the afternoon. Otto
observed a “black guy” and a “Mexican guy” get out of the car, go up to the trailer, and knock
on the door. She then walked home and did not see anything else occur. Otto testified that she
picked DeLuna out of a photographic lineup, but identified the wrong man in a live lineup. She
also identified Nubian Cooper as the black man at Smith’s trailer.
Larry Ball
      Larry Ball assisted in processing the crime scene. He testified that he collected four shell
casings from the kitchen area of the trailer. Ball testified that he had no knowledge of what was
done with the casings after he collected them. The casings were admitted into evidence.
Robert Poole
      Robert Poole, chief of the physical evidence section of the Dallas County Crime Lab, testified
that he is the custodian of records regarding firearms examinations conducted at the Southwestern
Institute of Forensic Sciences. Poole was the sponsoring witness for a report showing that all of
the shell casings and bullets collected from Smith’s trailer were fired by the same nine millimeter
gun. Poole testified that nothing in the report would link DeLuna to the gun which killed Smith.
Dan Trippel
      Dan Trippel, a detective with the Dallas Police Department, testified that he aided the
Waxahachie police with the investigation of Smith’s murder. He said that, based on the holes in
the cabinet behind Smith and the wounds in Smith’s body, he determined that Smith was in a
kneeling position when he was shot.
Ronald Williams
      Ronald Williams, a Dallas police officer, responded to a call regarding an abandoned vehicle
the day after Smith’s murder. He discovered that the vehicle was listed as stolen during a
homicide and called the physical evidence section of the police department to check it for evidence
of Smith’s murder. Williams identified the vehicle he found as Smith’s custom-painted truck.
Alwin Barrow
      Alwin Barrow, chief of the Waxahachie Police Department, testified that he and Deputy Chief
Craig Rudolph went to DeLuna’s house after determining that he was a suspect. He said they saw
a maroonish-colored pickup truck in DeLuna’s driveway with two men, one white and one
Hispanic, standing beside it. The two men then got into the maroon pickup and left. Barrow
testified that they tried to follow the men but lost them at the next main intersection.
Billie Wiggins
      Billie Wiggins, a lieutenant with the Waxahachie Police Department, testified that she
discovered drugs and drug paraphernalia in the back bedroom of Smith’s trailer. She also saw a
knife, a drill, and a club in the living room. Wiggins believed a struggle had occurred.
Patricia Smith
      Patricia Smith testified that Smith’s custom truck was in his driveway when she and Rodger
left for Dallas around 3:00 p.m. on November 7. She testified that upon returning from Dallas
around 6:50 in the evening she noticed that Rodger’s truck, which Smith had borrowed, was back,
but Smith’s custom truck was gone. Patricia testified that they noticed Smith’s doors open, and
Rodger went to investigate. After Rodger found Smith, they called 9-1-1. After making the call,
Patricia called Derwin Rogers, the park’s maintenance man, and asked him to meet her at Smith’s
trailer. She said that she and Rogers found Smith in a pool of blood. Patricia testified that on a
number of occasions Smith and DeLuna would go to the back bedroom of Smith’s trailer and
afterward Smith would have drugs. 
Kimberly McKown
      Kimberly McKown dated Smith for a couple of years prior to his death. She testified that
while dating Smith she met DeLuna, whom she believed to be Smith’s friend. McKown testified
that she saw Smith use drugs and that his supply was always replenished after going into the back
bedroom of his trailer with DeLuna.
Jerri Threadgill
      Jerri Threadgill, Smith’s ex-wife, testified that she and Smith had a son together. She met
DeLuna at Smith’s trailer about a year prior to Smith’s death. Approximately one or two months
before Smith’s death, she took their son to spend the night with him. While in the bathroom, she
heard an argument erupt out in the living room. She came out of the bathroom and discovered
DeLuna demanding money from Smith, but Smith denied owing DeLuna any money. Threadgill
testified that she thought they were going to fight, but that DeLuna backed down and said “friends
don’t do friends this way. You just remember, whatever happens wasn’t supposed to be this
way.” He then kicked the door open and left. Threadgill said that Smith looked terrified after
DeLuna left. 
Angelina Hardaway
      Angelina Hardaway testified that she lived with Smith around 1994 for about a year. She
testified that she saw Smith and DeLuna use drugs and that she saw DeLuna sell drugs to Smith. 
Sometimes Smith would pay upon delivery of the drugs, but sometimes he would not. Hardaway
testified that when she and Smith would go out with DeLuna and his girlfriend, Smith and DeLuna
would often play darts. If Smith won, DeLuna would tell him to subtract that amount from his
debt.
Jo Ann Rogers
      Jo Ann Rogers, manager of Pine Meadows Mobile Home Estates, testified that she could see
Smith’s trailer and driveway from the window of her office. On the afternoon of November 7,
she observed Smith get home around 4:25. She said his custom-painted truck was in his driveway
at the time. About fifteen minutes later, a car drove up to Smith’s trailer and a “black man” and
a “Hispanic man” got out. She identified Nubian Cooper as the black man, but said she did not
get a very good look at the Hispanic man. Rogers stated that she then left the office to pass out
“rent-due notices.” When she got around to Smith’s trailer, the car and Smith’s custom truck
were gone. Rogers testified that she put two more notices on trailer doors and returned to her
office at 5:10.
Travondalynn Wright
      Travondalynn Wright testified that she was visiting family in Smith’s trailer park on
November 7. That afternoon, she and her friend went around the park selling raffle tickets. 
Wright said that she went to the front of the park around 5:00 p.m. to use the pay phone and saw
a car go to Smith’s house. She heard the men in the car say they were going to “get him.” 
Wright stated that a “black man” and a “Mexican man” got out of the car with guns. She then
heard about six or seven gun shots. She identified DeLuna as one of the men at Smith’s trailer
in a photo lineup, in a live lineup, and in court. She also identified Nubian Cooper as the black
man at the scene. Wright’s statement was introduced into evidence. In it, she stated that it was
around 6:00, not 5:00 when these events transpired. 
Jerrilynn Strong
      Jerrilynn Strong, an acquaintance of Billy Romines, testified involuntarily pursuant to an
immunity agreement. She stated that on November 7, Romines called her and then brought
DeLuna to her house. She testified that Romines called his wife and said “get your butt over here. 
It’s a matter of life and death.” Strong stated that DeLuna asked her to turn on a police scanner,
which she did. 
Billy Romines
      Billy Romines testified that he has a “working” relationship with DeLuna—he sells drugs for
him. He said that on November 7, he spoke with DeLuna several times. The first time DeLuna
called and stated that he wanted some money that Romines owed him. This was around 6:00 or
7:00 in the evening. DeLuna called him later, sometime after 10:00 that night, and asked him to
pick him up at his house. He said DeLuna “sounded panicked.” Romines testified that he arrived
at DeLuna’s house around 10:30 or 11:00 p.m. and started to get out of the truck, but that DeLuna
came out of the house, got in the truck, and told Romines to drive away. Romines said they
noticed the police following them, and DeLuna said “we have to get away from them.” Romines
testified that they headed towards Strong’s house. 
      On the way to Strong’s house, DeLuna told Romines that he had sent Nubian Cooper and
“some guy named Nester” to collect money from Smith and “things got out of hand.” Romines
said that DeLuna had asked him to check out Nubian’s criminal history about a week before this
incident, specifically asking him to check whether Nubian had ever testified against anyone. 
Romines said that DeLuna threw a gun out the window of the truck before they arrived at Strong’s
house. 
      Romines stated that when they first arrived at Strong’s house he called his wife to bring a
different vehicle in case the police had seen the truck they were in. He told her to hurry because
it was an emergency. When his wife, Cathy, arrived, DeLuna wanted to do drugs. Romines
testified that this made Cathy angry because she did not consider that to be an emergency and she
left in the same vehicle in which she had arrived. 
      Romines testified that he and DeLuna then decided to leave Strong’s house and go to his son
Christopher’s house. Romines said he left DeLuna at Christopher’s house and went back to
Strong’s, returning to Christopher’s around 4:00 or 5:00 in the morning. 
      Romines testified that DeLuna believed his ex-wife, Mary DeLuna, for whom he still cared
deeply, was having an affair with Smith. 
      Romines testified that the State agreed that the Dallas County District Attorney’s office would
be told of his cooperation in this case. Romines said he hoped to receive a lesser sentence on
pending charges in Dallas because of his cooperation.
Cathy Romines 
      Cathy Romines testified that Romines called her from Strong’s house and told her it was very
important for her to hurry over. When she arrived, DeLuna asked her to inject him with drugs. 
She testified that she became angry and left. She had a friend named Julie Palmer with her. Cathy
said that she drove a short distance and then went back to Strong’s house, but Romines and
DeLuna had already left. Around 1:00 that morning, she discovered her keys were locked in the
car and called Romines on his cellular phone. She said that he returned, recovered her keys, and
then they went home. 
Julie Palmer
      Julie Palmer testified to being with Cathy that night and corroborated her testimony. Palmer,
who lived with Christopher, said that DeLuna stayed at Christopher’s for several days after
November 7.
Todd Woodruff
      Todd Woodruff, a detective with the Waxahachie Police Department, testified that he became
involved in this case a few days after Smith was murdered. Woodruff showed photo lineups to
witnesses, searched DeLuna’s home, and arrested him. He testified that DeLuna had between
$3,600 and $3,700 with him when he was arrested. 
      Woodruff also testified about arresting Nubian Cooper and taking a pager from him. The
phone records in evidence showed a call at 6:10 p.m. on November 7 from DeLuna’s phone to
Cooper’s pager. 
Jagiuti Patel
      Jagiuti Patel’s family owns and lives at the Texas Inn motel on I-35 across the street from the
trailer park in which Smith was killed. On November 7, Patel was working at the front desk of
the motel starting at 4:00 in the afternoon. She testified that Nubian Cooper checked into the
motel while it was still daylight, somewhere around 5:00 that afternoon. She said that someone
sat in the car while he checked in, but that she did not see that person clearly.
Christopher Romines
      Christopher Romines testified that his father, Billy Romines, brought DeLuna to his house
the night of November 7. He said that DeLuna was acting nervous, upset, and scared. DeLuna
stayed at his house about three days, and he could tell that there was a problem. When asked what
DeLuna told him, Christopher said, “him and a black guy went down there and took care of
business.” Christopher testified that he knew what it meant to say they “took care of business,”
and he asked DeLuna which one of them shot Smith. He said that DeLuna would not tell him. 
Christopher said that DeLuna showed him a Beretta nine millimeter handgun and told him that it
was the gun used to “take care of business.” Christopher further testified that DeLuna said Mary,
DeLuna’s ex-wife, would not be going to visit Smith in Waxahachie anymore. 
Barroni Donawho
      Barroni Donawho testified that Smith was her uncle. She said Smith called her on November
6 from Mary DeLuna’s house to set up a time for him to get money she owed him. The remainder
of her testimony was excluded as hearsay. 
Ryan Anway
      Ryan Anway testified that he was helping Benjamin Flint, Christopher’s brother-in-law, move
out of Christopher’s house on November 7. Anway said that they were at Christopher’s house
between 11:00 p.m. and 1:00 a.m. getting Flint’s personal items together. DeLuna was there
along with Romines and Christopher. Anway did not hear anything about the events of that night. 
He said that Christopher was very upset when he learned that his wife was having an affair with
DeLuna, and that Christopher threatened DeLuna, although he could not remember when this
threat took place.
John Blaquiere
      John Blaquiere works as a security and facilities manager for Southwestern Bell Wireless. 
He testified that they use time-lapse video recorders for security. On November 7, 1996,
Blaquiere had a security camera working at a Southwestern Bell Cellular store on Stemmons
Freeway in Dallas. A videotape was offered into evidence and admitted through Blaquiere’s
testimony. Blaquiere testified that it fairly depicted what occurred at the store during the time in
question, except that the time stamp was one hour ahead of the correct time and showed the year
to be 1995 instead of 1996. Blaquiere said that he could tell that the time on the video was wrong
because sometime late in 1996 he called the store and had them check the actual time against the
time on the video camera and discovered that it was almost exactly one hour off. Also, because
the video showed that the lights went off in the store one hour later than they were supposed to
close, he estimated that the video clock was one hour fast. 
      On cross-examination, Blaquiere admitted that he really had no way to know whether the time
on the video was correct or not because it was only brought to his attention that it might be wrong
weeks after the events were recorded. 
Michael Mitchell
      Michael Mitchell, an employee with Southwestern Bell Wireless, worked as an installation
technician on November 7. He said DeLuna came to the store between 5:30 and 6:30 that
evening. The videotape admitted into evidence earlier was played at this time. It showed DeLuna
at the store at 1923 hours, or 7:23 p.m. Mitchell said that the time on the video had to be wrong
because the store closed at 7:00 p.m. He testified that it was “probably 6:23.” 
John Garcia
      John Garcia, also an employee with Southwestern Bell Wireless, testified that DeLuna came
into the store on November 7, 1996. 
Nestali Garza
      Nestali Garza testified that he was with DeLuna on November 7. DeLuna came by his house
around 5:30 or 5:45 that evening and asked him to go to the Southwestern Bell store with him. 
They arrived at Southwestern Bell around 6:20 or 6:30 that evening. Garza said that they left the
store around 6:45 p.m. and went to a club, where they stayed until about 8:00 p.m. He said that
DeLuna dropped him off at a pool hall and he did not see DeLuna again that night. 
SUFFICIENCY OF THE EVIDENCE
      DeLuna’s first issue asserts that the evidence is legally and factually insufficient to support 
a conviction for capital murder. Specifically, he complains that the State failed to prove 1) intent
to kill and 2) that the murder was committed in furtherance of robbery. Sufficiency of the
evidence is measured by the elements of the offense as defined by a hypothetically correct jury
charge for the case. Malik v. State, 953 S.W.2d 234, 238-40 (Tex. Crim. App. 1997). 
Legal Sufficiency
      In determining whether the evidence is legally sufficient to support the verdict, we view the
evidence in the light most favorable to the verdict, asking whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. Weightman v. State,
975 S.W.2d 621, 624 (Tex. Crim. App. 1998); Lane v. State, 933 S.W.2d 504, 507 (Tex. Crim.
App. 1996) (citing Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61
L.Ed.2d 560 (1979)); Westfall v. State, 970 S.W.2d 590, 595 (Tex. App.—Waco 1998, pet.
ref’d). 
      DeLuna was convicted of capital murder by committing murder (intentionally causing the
death of another) while in the course of committing or attempting to commit robbery. Section
19.03 of the Penal Code provides:
      (a)  A person commits an offense if he commits murder as defined under Section 19.02(b)(1)
and:
. . .
            (2)  the person intentionally commits the murder in the course of committing or
attempting to commit kidnaping, burglary, robbery, aggravated sexual assault, arson,
or obstruction or retaliation; . . . . 

Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon 1994). A person commits robbery if:
. . . in the course of committing theft . . . and with intent to obtain or maintain control of the
property, he:
      (1)  intentionally, knowingly, or recklessly causes bodily injury to another; or
      (2)  intentionally or knowingly threatens or places another in fear of imminent bodily injury
or death.

Id. § 29.02(a) (Vernon 1994). Theft occurs when a person unlawfully appropriates property with
intent to deprive the owner. Id. § 31.03(a) (Vernon 1994).
      The indictment alleges that, while in the course of committing a robbery, DeLuna
intentionally caused Smith’s death by shooting him with a firearm. The jury charge authorized
a conviction for capital murder based on the law of parties and conspiracy. Thus, the jury could
have convicted Smith whether or not they believed he was actually present when the crime was
committed. Viewed in the light most favorable to the verdict, the evidence shows that DeLuna
sold drugs to Smith on a regular basis and that DeLuna believed Smith owed him money for
previous drug sales. Witnesses placed DeLuna and Cooper at the scene with a gun around the
time that Smith was murdered. Christopher Romines testified that DeLuna showed him a nine-millimeter gun and told him that he used the gun to “take care” of Smith. Smith’s custom-painted
truck was taken around the same time that the men identified as DeLuna and Cooper left Smith’s
trailer. The truck was found the next day in Dallas. Based on this evidence, a rational jury could
have believed that DeLuna went to Smith’s house with the intent to kill him and take his truck and
did both. Thus, a jury could have found the essential elements of the crime beyond a reasonable
doubt. Westfall, 970 S.W.2d at 595. The evidence is legally sufficient. 
Factual Sufficiency
      Based on our review of the evidence for the legal sufficiency determination, we have some
doubts about the factual sufficiency of the evidence to support the charge that DeLuna intended
to rob Smith at the time Smith was killed. However, because we will remand this cause for
another error, we forego a determination of the factual sufficiency of the evidence. Issue one is
overruled as to legal sufficiency and is not reached as to factual sufficiency.
LESSER-INCLUDED OFFENSE
      DeLuna’s second issue asserts that the court erred in failing to charge the jury on the lesser-included offense of murder. In determining whether a jury must be instructed on a lesser-included
offense, a two-step analysis must be applied. Reeves v. State, 969 S.W.2d 471, 488 (Tex.
App.—Waco 1998, pet. ref’d) (citing Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim.
App. 1993)). First, the lesser-included offense must be included within the proof necessary to
establish the offense charged. Id. Second, there must be some evidence in the record that would
permit a rational jury to find that if the defendant is guilty, he is guilty of only the lesser offense. 
Id. Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser
charge. Id. (citing Bignall v. State 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). 
      It is undisputed that murder is a lesser-included offense of capital murder. The question is
whether there was some evidence presented at trial that would show DeLuna guilty of only murder
and not of capital murder. If there is evidence that DeLuna committed murder but no evidence
that he intended to rob Smith, then DeLuna was entitled to an instruction on murder.
      As we have noted, a rational jury could find from the evidence that DeLuna went to Smith’s
trailer with the intent to kill him and could infer that he intended to rob him. On the other hand,
because there is minimal evidence regarding the theft of Smith’s truck, a rational jury could have
believed that DeLuna went to collect money from Smith, murdered him, but did not have the intent
to rob him when he committed the murder. Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim.
App. 1995) (“For a murder to qualify as capital murder under section 19.03(a)(2), the intent to
rob must be formed before or concurrent with the murder.”). In that case, the jury would have
been entitled to find him guilty of murder. Thus, the jury should have been instructed on the
lesser-included offense. See Reeves, 969 S.W.2d at 488. 
HARM ANALYSIS
      Having found error in the charge, we turn to the question of harm. Almanza v. State governs
the issue. 686 S.W.2d 157 (Tex. Crim. App. 1985) (on rehearing). DeLuna objected to the
charge and specifically requested an instruction on the lesser-included offense of murder. The trial
court denied his request. Because the error in the charge was brought to the trial court's attention
when it could have been corrected, DeLuna is entitled to a reversal if he can show “some harm.” 
Id. at 171.
      The jury had to choose between capital murder, which carries a sentence of life imprisonment,
and an acquittal. Had the jury been correctly charged, DeLuna might have been found guilty of
murder, which carries a punishment range of 5 to 99 years or life in prison. We find that he
suffered “some harm” and sustain DeLuna's second issue. 
      The judgment is reversed and this cause is remanded for a new trial. 
 
                                                                                 BILL VANCE
                                                                                 Justice

Before Chief Justice Davis,
          Justice Vance, and
          Justice Gray
          (Justice Gray dissenting)
Reversed and remanded
Opinion delivered and filed August 18, 1999
Do not publish