**Alberto SIFUENTES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–98–0408–CR.**

Court of Appeals of Texas,
Amarillo.

Aug. 28, 2000.

Patrick S. Metze, Levelland, for appellant.

Sandra Bowers Self, Special Prosecutor, Abilene, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

JOHN T. BOYD, Chief Justice.

Presenting ten issues for our decision, appellant Alberto Sifuentes challenges his conviction of capital murder and the resulting sentence of life confinement in the Institutional Division of the Department of Criminal Justice. Appellant argues in his issues that 1) he should be granted a new trial because the jury charge and the verdict are lost or destroyed; 2) the evidence is legally insufficient to support the conviction; 3) the evidence is factually insufficient to support the conviction; the trial court erred in 4) overruling appellant's motion to suppress illegally seized evidence and fruits of an illegal detention; 5) admitting evidence obtained in violation of the Vienna Convention on Consular Relations; 6) admitting evidence obtained in violation of article 38.23 of the Code of Criminal Procedure; 7) denying appellant's request for a jury instruction that the Vienna Convention on Consular Relations was in full force and effect; 8) denying appellant's request for a jury instruction that the Vienna Convention on Consular Relations requires that a detained alien be informed of his/her right to contact his/her consulate; 9) denying appellant's request for a jury instruction under article 38.23 of the Texas Code of Criminal Procedure; and 10) denying appellant's request for a jury instruction that if the terms of the Vienna Convention on Consular Relations were violated, then the jury must disregard evidence obtained as a result of that violation. Disagreeing that reversal is required, we affirm the judgment of the trial court.

■ Initially, appellant contends that several orders of the trial court, the jury charge, and the verdict are missing from the clerk's record. Because he is challenging the sufficiency of the evidence and the evidence must be measured against the charge given to the jury, appellant asserts the inclusion of the jury charge is essential to appellate review and in its absence, he must be given a new trial.

On May 22, 2000, the Lamb County District Clerk supplemented the clerk's record with the jury charge and the verdict signed by the jury foreman. While five orders referenced in appellant's Exhibit A attached to his brief are apparently still not included in the clerk's record, it is not clear whether the reason is the result of a failure on the part of the clerk to include them or on the part of one of the parties to obtain a signed order and file it with the clerk. Nevertheless, the record does show the trial court's action on each of the motions. Because appellant has not alleged or shown any specific harm from the absence of these orders from the clerk's record, we overrule his first issue.

In his second and third issues, appellant challenges the legal and factual sufficiency of the evidence to sustain his conviction. In his argument, appellant claims that while he "could for the purposes of this brief make a summary of the evidence presented at trial and make appropriate references to the Recorder's Record of the trial, without the wording of the jury charge, such analysis would be meaningless as Appellant has no way to cite to the language of the charge." He also requests that if the clerk's record is supplemented with the missing charge, that he be allowed sufficient time to amend or supplement his brief. However, in his brief, appellant has provided an eight and a half page statement of the facts, which includes references to the record and is very thorough in its content. It is sufficient to explicate his arguments.

■ In considering appellant's legal sufficiency challenge, we are required to view the evidence in a light most favorable to the prosecution and then determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Weightman v. State*, 975 S.W.2d 621, 624 (Tex.Crim.App.1998); *Lane v. State*, 933 S.W.2d 504, 507 (Tex.Crim.App.1996) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)). In considering factual sufficiency challenges, we must view all the evidence without the prism of "in the light most favorable to the prosecution" and we may only set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (citing *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd untimely filed)). In performing our review function, we must remember that the trier of fact is the sole judge of the weight and credibility of the testimony, and we must be appropriately deferential so as to avoid substituting our judgment for that of the jury. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App. 1997). We must also bear in mind that a decision is not manifestly unjust because a factfinder has resolved conflicting views of the evidence in favor of the State. *Cain v. State*, 958 S.W.2d 404, 410 (Tex.Crim.App. 1997).

Under the jury charge, the State was required to prove that appellant intentionally committed murder in the course of committing or attempting to commit the offense of robbery. Because of the nature of appellant's challenges, a brief recitation of the pertinent evidence is necessary. Shortly after 2:00 a.m. on August 6, 1996, Evangelina "Angie" Cruz was robbed, shot nine times, and killed. At the time, she was working at the Jolly Roger convenience store in Littlefield. At approximately 2:08 a.m., the victim called 911 seeking assistance. While she was talking on the telephone, Tracy Matheny entered the store and found her bleeding. Tracy

also observed that the cash register was open. Tracy asked the victim who had done this to her and the victim replied, "man, boy." Tracy's companion, Jackie Johnson, who had also entered the store, testified that the victim said the man who shot her was either Spanish or Hispanic and left by the north door. Matthew Wooley, another of Tracy's companions, averred that the victim said the words "man, boy" and something like "gold car." Although Tracy and her companions had been drinking and had smoked some marijuana and/or crack cocaine earlier in the day, they testified that they were not intoxicated.

Police Sergeant Craig Thompson, the first officer on the scene, found the victim in "pretty bad condition." When he asked the victim who shot her, she said "it was two Hispanic males, one with long hair and one with short hair, about 18 to 20 years of age." [1] She also said that one of the males was wearing "shades" and mentioned a gold car. The victim was subsequently transported to the hospital where she was pronounced dead within the hour.

Appellant, Jesus Ramirez, and Mary Davila Wood had been in Littlefield that night in a gold car going to and from a club in Lubbock. While passing through Littlefield on their way to Lubbock, they had stopped at the home of appellant's girlfriend, Mary Ellen Gallegos, to ask if she wanted to go with them. She was not home, but appellant talked to her by telephone and she declined. At that time, another person in the home described appellant as wearing a "button up dress shirt, long sleeves, bluejeans and boots." The bartender at the club in Lubbock said that Ramirez, Wood, and another man left the club no later than midnight.

Wood said that she had two beers on the way to Lubbock and more than four drinks at the club, as a result of which she passed out in the car when they left Lubbock. She was later awakened at a time when she heard the door slam as both appellant and Ramirez entered the car at the same time and at a place which she later identified as the Jolly Roger convenience store in Littlefield. Appellant was driving the car and, she said, ran a stop sign by the store as they drove away. She went back to sleep until the car was stopped by a police officer.

At approximately 2:55 a.m., Police Officer Harley "Buddy" Boelyn stopped the vehicle appellant was driving. He did so, he averred, because of a call to be on the lookout for a gold car occupied by two Hispanic men, one with long hair and the other with short hair. At the time, the officer saw white papers on the floorboard of the car "like you wrap burritos or sandwiches in at a convenience store." He also noted the vehicle was clean and that appellant was wearing a western shirt, freshly pressed jeans and western boots. Initially, appellant spoke to the officer in English but when told why he was stopped, switched to Spanish. Because he did not see anything directly connecting the occupants of the car to the crime, they were allowed to go.

Brenda Ayala averred she was in the Jolly Roger at what she initially believed to be 2:00 a.m. on the morning in question. [2] She saw two men in the store standing unusually close to one another. One of the men told Ayala to go ahead even though she was not ready to check out at the time. She later identified a photograph of appellant as being one of the men and gave a description of the other from which a composite drawing was made. She described the men as wearing

---

1. The evidence showed that at the time of the offense, appellant had long hair and Ramirez had short hair. However, Ramirez appeared considerably older than twenty and is described in appellant's brief as being 48 years old.

2. She testified that she was in another convenience store just prior to being in the Jolly Roger and the video tape from that store indicates that she was there at 12:34 a.m.

jeans, tank tops, and tennis shoes. Later, at a lineup, she picked out Ramirez as one of the men she had seen in the store. At a lineup which included appellant, she initially picked out another man as being Ramirez's companion. However, shortly afterwards she called to say that appellant was the other man. The explanation she gave for not picking appellant originally was that she had not noticed appellant's "sleepy eye" in the store. She attributed the error to the fact that appellant had bangs hanging down over his forehead.[3] At trial, Ayala identified appellant as one of the men she saw in the Jolly Roger that night.

Although a print from a tennis shoe was found on the counter of the store, that print was never linked to either appellant or Ramirez. There was conflicting evidence as to whether or not the shooter may have stood on the counter. In a search of the gold car a week later, a roll of nickels consistent with other rolls taken from the store was found in the car. In a search of Ramirez's home, an ammunition box and a .22 caliber handgun were found. Although tests revealed the handgun was not used in the shooting, the bullets taken out of the victim and the cartridge casings found at the scene were consistent with ammunition contained in the box. A white sack located outside the Ramirez home was of the same size and color as those used at the Jolly Roger. There was also testimony from Tracy Frazier, who was an inmate of the jail with appellant, that appellant stated he was a different person when he drinks and he was the one who shot "the lady."

■ At trial, appellant challenged the credibility of a number of the State's witnesses, including Ayala, Wood, Matheny, Wooley, Johnson and Frazier, all of whose testimony came closest to tying appellant to the crime. There were also discrepan-

cies in the time lines established by the State as well as discrepancies in the description of the clothing worn by appellant at relevant times. Appellant also attempted to explain the words spoken by the victim as "me voy" which, in Spanish, means "I am going" or "I am fading" rather than "man, boy." These discrepancies and interpretations were well within the jury's province to resolve and determine the credibility and weight to be given the evidence. Because of the full development of the facts, additional briefing on the part of appellant would not substantially aid us in the determination of the second and third issues, and they are overruled.

In his fourth, fifth, and sixth issues, appellant asserts the trial court erred in failing to suppress evidence and its fruits obtained in violation of the Vienna Convention on Consular Relations. He also claims the trial court erred in admitting evidence obtained in violation of article 38.23 of the Code of Criminal Procedure. Tex.Code Crim. Proc. Ann. art. 38.23 (Vernon Supp.2000). Inasmuch as these points are briefed and argued together, we will likewise consider them together.

■ The Vienna Convention on Consular Relations grants a foreign national who has been arrested or taken into custody a right to contact his consulate and also requires the arresting authorities to inform the individual of this right "without delay." *Maldonado v. State*, 998 S.W.2d 239, 246–47 (Tex.Crim.App.1999) (*citing* Vienna Convention on Consular Relations, April 24, 1963, Art. 36(1)(b), 21 U.S. T. 77, 100–101 (ratified by the United States on Nov. 24, 1969)). Appellant contends that because he is a Mexican national and that either no notice of this right was given or, if one was given, it was given late, "there must be a Texas state court remedy for Appellant, for the violation of this treaty,

3. There was testimony in the record that after the lineup, Ayala may have overheard appellant's attorney talking about the fact that she initially failed to identify appellant. The im-

plication, of course, was that she changed her identification because of the overheard conversation.

and its substantial effect on his trial." In the event the provisions of the treaty are not complied with, appellant argues that the exclusionary provisions of article 38.23 of the Code of Criminal Procedure pertaining to evidence illegally obtained would provide an appropriate remedy. Thus, he reasons, all evidence obtained after August 12, 1996, the date of his detention and interrogation, should be suppressed.

Relative to this question, Texas Ranger Sal Abreo testified that he apprised appellant of his right to seek advice from his consul. He stated that "I tell every illegal alien that they do have a right to contact the consulate, as well as their constitutional rights." He said that he knew appellant was an illegal alien because appellant told him so. However, Vice–Consul of Mexico, Silvia N. Paramo, testified that the consulate was not notified of appellant's arrest until July 1, 1997. She also said that although she had no personal knowledge of the fact, appellant had told the consul that no one had advised him of the consular right.

Article 38.23 of the Code of Criminal Procedure, in relevant part, states:

> (a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex.Code Crim. Proc. Ann. art. 38.23(a) (Vernon Supp.2000). Appellant argues that a treaty right falls within the meaning of "laws of the United States," and a violation of this particular treaty requires the suppression of any evidence obtained after appellant should first have been advised of his rights.

However, our Court of Criminal Appeals has recently written on this very issue. In *Rocha v. State*, 16 S.W.3d 1 (Tex.Crim. App.2000), the court held that because of the purpose and function of treaties and "the uniquely federal aspect involved in enforcing international agreements," treaties do not constitute "laws" within the purview of article 38.23. *Id.* at 19. Thus, the court concluded, in the absence of contrary instruction from the United States Supreme Court, it would not recognize a federal exclusionary rule at this time. *Id.* See *U.S. v. Li*, 206 F.3d 56, 60 (1 st Cir. 2000), *petition for cert.* filed May 26, 2000 (No. 99–9770) and May 30, 2000 (No. 99–0768) and *U.S. v. Lombera–Camorlinga*, 206 F.3d 882, 885 (9 th Cir.2000), *petition for cert. filed* June 5, 2000 (No. 99–9927) (holding that exclusion of evidence is an inappropriate remedy for such a violation).

The Supreme Court has said that even if Vienna Convention claims are properly raised and proven, it is extremely doubtful that the violation should result in the overturning of a conviction without some showing that the violation had an effect upon the trial. *Breard v. Greene*, 523 U.S. 371, 377, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). In this regard, Paramo admitted that by the time the consul talked to appellant, he had been appointed an attorney. She also stated:

> ... from the very moment when we contacted the attorneys, we decided that they were very capable. They were conscientious and they were doing everything to represent our nationals. What bothers me mostly is that in this case, for several cases in other cases, that the agreement of the Vienna Convention between the United States and Mexico has not been applied.

When queried how appellant was harmed by any violation of the treaty, Paramo could not state anything specific, but merely speculated that from the moment that a person can seek the backing of his government "it's the officers of the consulate who can contact their superiors so that they can secure backing or more reinforcement for this defense."

Appellant argues that harm occurred because the consul was not available to warn appellant not to talk to the police and arrange for legal counsel even before coun-

sel was appointed. Thus, he argues, "[a]ppellant made an incriminating statement, of sorts, to Ranger Sal Abreo while he was in custody or detained, was interrogated for two hours, and consented to a search of his residence." Appellant speculates that if he had been supplied information by the consulate with regard to the laws and procedure in Texas and the United States and provided advice on employment of local counsel to assist prior to the questioning, he would have refused to talk to the Ranger. Further, he reasons, he would not have been in custody "any longer a period of time than it would take for a phone call to the Mexican Consul in Midland, Texas."

Even so, the Ranger's testimony that he advised appellant of his *Miranda* rights in Spanish was uncontroverted. That warning provided appellant with essentially the same information that he says he would have received from the consul. Paramo could not say exactly when the consul actually spoke to appellant after being notified he was in custody, and there is no showing the consulate rendered any services to appellant other than to determine if he had an attorney. Thus, from this record, it appears appellant received at least the same benefits as an American citizen would have received and there is no showing that the results of the trial might have been different if the consul had been notified.[4] Appellant's fourth, fifth and sixth issues are overruled.

In his remaining issues, appellant contends the jury should have been instructed that the Vienna Convention was in force and applicable and the effect of a violation of that Convention, and that if they believed, or had a reasonable doubt, that the Convention had been violated, they should disregard all evidence obtained by a person in violation of it. However, for the reasons we have discussed above, the failure to give this instruction about the effect

of the Vienna Convention was not error. Appellant's last four issues are overruled.

In summary, all of appellant's issues are overruled and the judgment of the trial court is affirmed.

---

4. Appellant also claims that the Vienna Convention rights of Ramirez were violated, and this affected appellant's trial because of evidence recovered by a search of Ramirez's home and car. However, as we have already delineated, there is currently no rule requiring the exclusion of evidence obtained in violation of this treaty.