Becker v. State












COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS






RICHARD MORALES CASTILLO,


 Appellant,


V.



THE STATE OF TEXAS,


 Appellee,


§


 


§


 


§


 


§


 


§


 


 § 

No. 08-01-00147-CR



Appeal from the


205th District Court


of El Paso County, Texas


(TC# 990D01228)


M E M O R A N D U M O P I N I O N


 Richard Morales Castillo appeals his conviction for capital murder. A jury found
Appellant guilty but answered in the negative to the mitigation special issue. Accordingly,
the trial court imposed a life sentence. See Tex. Code Crim. Proc. Ann. art. 37.071 § 2(g)
(Vernon Supp. 2004). We affirm.

FACTUAL SUMMARY


 Appellant was indicted by an El Paso County grand jury for capital murder in
connection with the death of Richard Bracknell. The indictment alleged that Appellant,
while incarcerated in a penal institution, intentionally and knowingly caused Bracknell's
death by ligature strangulation, and Appellant murdered Bracknell with intent to establish,
maintain, or participate in a combination composed of two or more individuals. (1) The
indictment contained a second paragraph which alleged that Appellant intentionally and 
knowingly caused Bracknell's death by ligature strangulation while Appellant was
incarcerated in the El Paso County Detention Facility for capital murder. (2) 

 Steven Elliott, a detention officer with the El Paso County Sheriff's Department, is
the custodian of inmate records at the El Paso County Detention Facility. The records reflect,
among other things, the charges on which an inmate is held, and an individual inmate's
classification and behavior while incarcerated in the detention facility. On July 22, 1993,
Appellant was arrested and incarcerated in the detention facility on a murder charge. 
Following Appellant's indictment on August 10, 1993 for capital murder, the booking
records were manually changed to reflect the capital murder charge. 

 In an effort to ensure the safety of inmates, each inmate is classified according to his
prior criminal history, gang affiliation, and medical history. Thus, inmates whose criminal
history includes aggravated or violent offenses are kept separate from those inmates who are
considered nonviolent based on their history. The detention officers also separate inmates
based on gang affiliation to prevent violence in the jail. At the time of trial, there were four
prison gangs in the detention facility, Barrio Azteca, Mexikanemi or the Mexican Mafia as
it is sometimes known, the Texas Syndicate, and the Aryan Brotherhood. On February 10,
1994, the detention facility determined that it would place all Mexican Mafia members in cell
block 430 in order to protect them from members of Barrio Azteca. Appellant and Adan
Romero are members of Mexican Mafia and on February 10, 1994, both men were placed
in cell block 430 with other members of that prison gang. Between February 10, 1994 and
December 12, 1994, members of Mexican Mafia committed four assaults on other inmates
both in and outside of cell block 430. Detention facility officers determined that Appellant
was involved in four of the five assaults. 

 Copa Manuel Marquez is a floor control officer in the El Paso County detention
facility. According to him, the Mexican Mafia located in cell block 430 had a reputation for
assaulting other inmates and detention officers, and Marquez considered cell block 430 to
be a violent tank. Appellant and Adan Romero were tank bosses in cell block 430. A tank
boss runs the particular tank and imposes punishment, including assault, if inmates do not
obey his orders. On the morning of December 12, 1994, Marquez was working on the fourth
floor which included cell block 430. He performed a head count when he began his shift at
11 p.m. on the evening of December 11 and everything appeared normal. Marquez saw
Bracknell when coffee was served to the inmates at 4 a.m. in accordance with the regular
meal schedule, and he told him to get up, take a shower, and get dressed because he was
going to court for a hearing. Bracknell said "Fine". While serving breakfast between 5 a.m.
and 6 a.m., another detention officer advised Marquez that there was a problem in cell block
430. Upon entering cell block 430, Marquez heard a lot of yelling. The inmates were yelling
in Spanish, "My brother is ill. Get him a doctor. My brother killed him." Once he got the
inmates into their individual cubicles and they were locked down, Marquez went into the
shower where he saw Bracknell's body hanging with a sock tied around the neck. Marquez
grabbed the body and cut the sock with a small pocket knife. Once Bracknell's body was on
the ground, Marquez checked for signs of life but could not find a pulse. 

 Detective Sonia Vega was dispatched to the detention facility to investigate
Bracknell's death. In addition to seeing a man's gray sock tied around Bracknell's neck and
ligature markings, Vega observed blood coming from his nose and mouth, scratches on his
arms, fresh bruises and scratches on his back, and a wound on his knee. Investigators
checked all of the inmates in the cell block and found that Eddie Compean and Jose Castillo
had recent injuries. Compean had two fresh scratches above his right eyebrow and Castillo
had fresh bruising on his face and the knuckles of his right hand. Vega found Bracknell's
jail-issued identification bracelet in cell number 5 where Romero and another inmate were
located at the time of lockdown. A wet sweatshirt and a pair of wet socks were found in the
sink of cell number 6 where Appellant, Aaron Castillo and Eddie Compean were located
during lockdown. Vega interviewed the inmates and obtained valuable information from
Jose Salcedo and Ruben Cazares. Neither man was a member of the Mexican Mafia. Based
upon the information Vega received, investigators searched for and found a shank in cell
number 8. Raul Rivera was in cell number 8 at the time of lockdown. 

 Dr. Juan Contin performed an autopsy on Bracknell's body on December 12, 1994. 
The sock was still tied around Bracknell's neck. Dr. Contin noted that the horizontal ligature
marks on the neck and the deep groove indicated that someone had strangled Bracknell with
the sock. He explained that in a suicidal hanging, the ligature tends to slide up in the back,
and therefore, the marks would not be horizontal or deeply grooved as in this case. He did
find one mark on the neck consistent with hanging but stated it was made after Bracknell
died. Bracknell's hyoid bone, which is a small bone located between the thyroid and larynx,
had been fractured on both sides. This is extremely rare in suicidal hangings and indicated
that considerable force had been applied to the throat. Bracknell had deep scratches on his
right forearm which had been caused by considerable force. Dr. Contin also found bruises
on Bracknell's lower back, just under the chin, the right shin, forehead, and nose. The
bruising under the chin was likely caused by the sock slipping as Bracknell struggled against
the ligature. Dr. Contin determined that Bracknell died as the result of ligature strangulation
and the cause of death was homicide. The wounds he found were consistent with someone
wrapping a sock around Bracknell's neck and pulling on it. 

 Jose Salcedo, an inmate in cell block 430 at the time of the murder, testified on behalf
of the State at trial. Salcedo had been convicted of possession of marihuana in Louisiana in
1996 and had been placed on probation for five years. At the time of trial, a warrant had
been issued for Salcedo's arrest due to a probation violation but Louisiana was holding the
warrant until after trial at the request of the District Attorney's Office. Salcedo had pled
guilty to failure to identify in 1999 and been sentenced to time served. Additionally, he had
been given probation in 2000 for family violence. The State had also given Salcedo PR
bonds in connection with two family violence cases, had given him rides to the courthouse
to testify in other hearings related to this case, and had provided him with meals when
testifying. Salcedo, however, did not have an agreement with the State for the pending
family violence case. 

 Salcedo was moved into cell block 430 a few days before Bracknell's murder because
he knew some of the inmates in that cell block. He had known Eddie Cummings since
elementary school and he also knew Ruben Cazares and Eric Gomez. Salcedo was unaware
that cell block 430 was a Mexican Mafia tank until the day after he moved into the tank.
Salcedo observed an assault which took place in cell block 430 on December 10, 1994. The
following day during lunch, he observed Appellant arguing with Bracknell because Bracknell
had taken four slices of bread rather than the two to which he was entitled, and consequently,
someone else did not get their bread for the meal. Bracknell yelled back at Appellant and
told him that he could not yell at him because Appellant was "just a soldier". Romero broke
up the argument. Salcedo, who was in cell number 2 with Eddie Cummings, took a sleeping
pill and went to sleep at 9:30 p.m. on the evening of December 11. Sometime during the
night, Salcedo woke up when he heard a loud noise and the sound of people wrestling and
banging against walls. He heard the sounds of a struggle in cell number 4. Salcedo then
heard Bracknell saying in Spanish, "Give me a break, brother" and "No more, no more." 
Salcedo heard the sounds of someone choking for several seconds. Salcedo did not get up
to investigate and went back to sleep after it became quiet. 

 Ruben Cazares, another inmate in cell block 430 on December 12, 1994 testified on
behalf of the State. Cazares, who was on deferred adjudication probation for aggravated
robbery, was in the detention facility in connection with a probation violation. Since
Bracknell's murder, the State had released Cazares on PR bonds on three occasions when he
had violated the terms and conditions of probation. Unlike Salcedo, Cazares had an
agreement with the State regarding his testimony. In exchange for his truthful testimony, the
State would dismiss Cazares' pending motion to revoke and terminate his probation. 
However, the State did not have any agreements with Cazares regarding his other three
pending cases, an assault and two burglary of a habitation cases. The State had provided
Cazares with transportation and meals in connection with his testimony at other hearings in
this case. 

 Cazares knew that there were Mexican Mafia members, including Appellant, in the
cell block. Both Appellant and Romero ran the cell block meetings, but Cazares described
Appellant as the "owner" of the tank. Cazares did not attend the Mexican Mafia meetings
because he was not a member. On December 10, 1994, Bracknell, Compean, and Cummings
assaulted an inmate nicknamed Monstro who was a non-member of the Mexican Mafia. 
They beat him up because they believed he was giving information about them to the Barrio
Aztecas. On one occasion, Cazares turned up the volume on the television and Bracknell
informed him that only the Mexican Mafia members could change the volume on the
television. Cazares went back to his room and Cummings approached him and said in
Spanish for him not to feel bad because Bracknell was going to get it. Cazares recalled that
Bracknell had argued with Appellant about the volume on the radio in the dining room. On
another occasion, Appellant became angry because Bracknell shared an extra plate of food
with a non-member rather than with other members. On December 11, Cummings told
Cazares and the other non-members that something was going to happen to Bracknell that
evening and for them to stay in their cells. Cummings also told them to say they were asleep
if they were asked anything about it. Cazares went to sleep on the bunk where Eric Gomez
usually slept in cell number 7. Cazares woke up when the detention officers brought in the
coffee. He looked out the door of the cell and saw Appellant and Cummings walk out of cell
number 4. Moments later, he saw Appellant walk back into cell number 4, followed by
Cummings who pushed Bracknell into the cell. Bracknell had been standing by the cell door. 
All of the other Mexican Mafia members, except Romero, were in the cell and they grabbed
Bracknell. Romero stood in the doorway with a shank. The Mexican Mafia members held
Bracknell while Appellant wrapped a sock around his neck and choked him. Cazares heard
Bracknell say in Spanish, "Give me a break, brothers". Appellant replied, "It's official,
mother-f----r." Bracknell made gagging sounds for several seconds then dropped to the
floor. Appellant immediately walked out of the cell and the other members began cleaning
up the scene. Cazares could hear them flushing toilets and looking for rags to clean the floor. 
They were also looking for somewhere to hang Bracknell. He saw them walk past the cell
carrying Bracknell's body to the shower. Cazares then heard them turn on the shower and
close the curtain. After the murder, Appellant and Romero threatened to kill the non-members or their families if they said anything about the murder. Consequently, Cazares
initially told investigators that he had been asleep during the murder. 

 Sgt. James Nance, a detention sergeant with the El Paso County Sheriff's Department
provided expert testimony at trial about the Mexican Mafia. Nance is in charge of the
detention facility's Security Threat Group Intelligence Unit. Security threat groups are any
group of inmates who work together for the purpose of disrupting the activities and security
inside of the facility. Prison gangs such as the Mexican Mafia, Texas Syndicate, and Barrio
Aztecas are examples of security threat groups. The Security Threat Group Intelligence Unit
identifies members and follows the activities of these groups, and Nance maintains records
for the unit. 

 The Mexican Mafia is a prison gang which originated in 1984 and has spread
throughout the Texas prison system and jails. Its purposes are to control the environment in
the penal institution where its members are located and generate money for its members. The
members accomplish these goals through intimidation, violence, and extortion. The Mexican
Mafia has a paramilitary structure with generals, captains, lieutenants, sergeants, and
soldiers. In order to become a member of the Mexican Mafia, a person must be sponsored
by another member. The organization has a number of rules including that a member must
obey orders and may not disrespect another member. Failure to follow these rules could
result in a fine, being placed on probation, or even death. The highest ranking member is in
charge of the cell block and he usually has other members who assist him in controlling the
environment through, for example, establishing where people eat and who performs the clean
up duties. Members are not permitted to resolve disputes in the cell block without consulting
with the officer in charge of the cell block. 

 Nance identified Appellant as a lieutenant in the Mexican Mafia in 1994 and the
leader of the Mexican Mafia within cell block 430. As of December 12, 1994, Appellant was
being held at the detention facility on a capital murder charge. Romero was a sergeant and
second in command to Appellant. Bracknell was a soldier, not a ranking member. Nance
had previously recovered from cell block 430 a copy of the Mexican Mafia constitution. In
addition to describing the duties of each rank and decreeing that consequences that would
follow violation of the rules by any member, the constitution provides as follows:

 In being a criminal organization, we assume whatever aspect of criminal practices for
the benefit and advancement of the Mexikanemi. We deal in drugs, contracts of
assassination, prostitution, robberies of the highest degree, gambling, extortion, weapons or
any and every other thing criminally imaginable. 

 Jose Montenegro Reynaldo Elizondo testified on behalf of Appellant. Elizondo had
been the acting general of the Mexikanemi until 1999 when he resigned. At Elizondo's
request, the detention facility placed Mexikanemi members in cell block 430 in 1994. 
According to Elizondo, there is a difference between the Mexican Mafia in California and
the Mexikanemi of El Paso. The Mexikanemi was founded to promote civil rights within the
prison system, but he admitted that the organization was a criminal enterprise and it permitted
executions under extreme circumstances such as a person betraying the organization. 
Elizondo denied that there was an official hit on Bracknell because as acting general, he
would have known about it. Elizondo testified that Appellant and Romero were in charge
of cell block 430. He found the writings or "tagging" on the wall in cell block 430 to be
disrespectful of the Mexikanemi and he concluded that Appellant was not truly in control of
the tank. 

 The jury rejected Appellant's defense and found him guilty of capital murder as
alleged in the indictment. Because the jury found in Appellant's favor on the mitigation
special issue, the trial court imposed a life sentence. 

MOTIONS TO QUASH THE INDICTMENT


 By two issues, Appellant challenges the trial court's denial of various motions to
quash both paragraphs of the indictment. Issue Number One relates to Paragraph B while
Issue Number Two pertains to Paragraph A.

Arguments Related to Paragraph B


 In Issue Number One, Appellant contends that the trial court erred by denying his
motions to quash the indictment or strike paragraph B. This issue contains two sub-arguments: (1) Section 19.03(a)(6)(A) is unconstitutionally applied to Appellant in
Paragraph B of the indictment because he is being prosecuted for his status as an inmate; and
(2) the term "incarcerated" contained in Section 19.03(a)(6)(A) is vague and ambiguous, and
the legislative history does not support an interpretation of the statute which permits
prosecution of a person who has not been convicted of capital murder.

 Paragraph B of the indictment alleged that Appellant:

 [D]id then and there intentionally and knowingly cause the death of an
individual, namely: RICHARD BRACKNELL, by ligature strangulation,
while the said defendant was incarcerated in THE EL PASO COUNTY
DETENTION FACILITY for an offense under Section 19.03 of the Texas
Penal Code, to wit: CAPITAL MURDER. 


 On February 18, 2000, Appellant filed a motion to quash or strike paragraph B of the
indictment. The motion argues that Section 19.03(a)(6)(A) is being unconstitutionally
applied to Appellant because it does not require the State to prove his guilt of the underlying
capital murder but instead permits his conviction on proof that he had been merely arrested
for capital murder. The trial court denied this motion by written order on July 19, 2000.
Appellant filed a second motion to strike paragraph B on the date trial commenced, January
8, 2001, arguing that "[a] complete review of the records of the El Paso County Detention
Facility has established conclusively that on the date of the offense a (sic) charged in the
indictment, i.e., December 12, 1994, Defendant was not incarcerated for CAPITAL
MURDER." According to the motion, Appellant was not charged with capital murder until
December 20, 1994, eight days after the incident on which the current indictment is based. 
Arguing that it would be impossible for the State to prove that he was incarcerated for capital
murder, Appellant sought dismissal of Paragraph B. At the hearing on this motion, Appellant
presented testimony by detention officer Steven Elliott in an effort to prove that Appellant
was incarcerated for murder, not capital murder, at the time of Bracknell's murder. The State
countered with proof that Appellant was incarcerated for capital murder. At the conclusion
of the hearing, the trial court orally denied Appellant's motion to quash or strike paragraph 

B. 

 Preservation of Error

 The State contends that Appellant did not preserve his complaint regarding the alleged
vagueness of Section 19.03(a)(6)(A) because he has raised it for the first time on appeal. 
Appellant responds that his motion to quash and arguments at the hearing sufficiently
informed the trial court of this complaint. He also asserts that the parties and trial court were
aware of the argument because it was made in a co-defendant's case (Adan Romero) and was
briefed in a State's appeal in Romero's case. (3) As a prerequisite to presenting a complaint for
appellate review, the record must show that the complaint was presented to the trial court by
a timely request, objection, or motion that stated the grounds for the ruling sought from the
trial court with sufficient specificity to make the trial court aware of the complaint. Tex. R.
App. P. 33.1(a)(1)(A). Even constitutional complaints may be waived by failure to timely
raise an objection in the trial court. See Wright v. State, 28 S.W.3d 526, 536 (Tex. Crim.
App. 2000). A complaint that a statute is unconstitutional as applied because of vagueness
must be raised in the trial court in order to preserve error. See McGowan v. State, 938
S.W.2d 732, 741-42 (Tex. App.--Houston [14th Dist.] 1996), aff'd on other grounds sub
nom., Weightman v. State, 975 S.W.2d 621 (Tex. Crim. App. 1998). (4) Further, a defendant's
complaint on appeal must comport with the objection raised at trial. Santellan v. State, 939
S.W.2d 155, 171 (Tex. Crim. App. 1997). We have reviewed Appellant's motions and the
arguments made at the hearings and do not find that Appellant brought this argument to the
attention of the trial court. Even though the issue may have been raised by a co-defendant
in separate proceedings, that does not inform the trial court that Appellant also asserted the
error. Consequently, Appellant did not preserve his vagueness argument and it will not be
addressed in this appeal. 

Prosecution for Status as Inmate


 We turn to Appellant's argument that Section 19.03(a)(6)(A) is unconstitutionally
applied to him in Paragraph B of the indictment because he had not been convicted of capital
murder but was merely awaiting trial on that charge. Citing Robinson v. California, 370 U.S.
660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), Appellant asserts that because he had not been
convicted of capital murder, he is being prosecuted for his status as an inmate as opposed to
conduct. It is a substantive due process requirement that every fact necessary to constitute
the crime with which an accused is charged be proven beyond a reasonable doubt. In Re
Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Further, criminal
penalties may be inflicted only if the accused has committed some act or has engaged in
some behavior which society has interest in preventing, or in other words, the accused has
committed an actus reus. Powell v. Texas, 392 U.S. 514, 533, 88 S.Ct. 2145, 2154, 20
L.Ed.2d 1254 (1968). Thus, a person commits an offense only if he or she voluntarily
engages in conduct proscribed by a criminal statute. Tex. Pen. Code Ann. § 6.01(a) (Vernon
2003); Beier v. State, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985). Conduct means an act or
omission and its accompanying mental state. Tex. Pen. Code Ann. § 1.07(a)(10) (Vernon
Supp. 2004). A criminal statute that criminalizes status as opposed to conduct is
unconstitutional. See Beier, 687 S.W.2d at 4. In Robinson v. California, 370 U.S. 660, 82
S.Ct. 1417, 8 L.Ed.2d 758 (1962) the United States Supreme Court held that a California
statute that criminalized the mere status of narcotics addiction was unconstitutional. 
Robinson, 370 U.S. at 667, 82 S.Ct. at 1420-21. And in Baker v. State, 478 S.W.2d 445
(Tex. Crim. App. 1972), the Court of Criminal Appeals held that the Texas vagrancy statute
was unconstitutional because it made the status of poverty and/or unemployment a crime. 
But, if a statute requires conduct in addition to status, the statute passes constitutional muster. 
See Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (holding Texas
public intoxication statute constitutional because it required conduct in addition to status).


 Section 19.03(a)(6)(A) does not attempt to criminalize Appellant's mere status as an
inmate. To the contrary, it proscribes conduct, namely, murdering an individual while the
actor is incarcerated for capital murder. By proving that Appellant intentionally or
knowingly caused Bracknell's death while Appellant was incarcerated for capital murder, the
State satisfied Winship's due process requirements. Issue Number One is overruled.

Arguments Related to Paragraph A


 In Issue Number Two, Appellant argues that Paragraph A of the indictment failed to
provide him with adequate notice of the charge against him because the term "combination"
used in the indictment is vague and indefinite. Appellant asserts that the indictment does not
supply a definition of the term "combination", Chapter 19 of the Penal Code does not contain
a definition, and there is no commonly accepted definition of the term.

 Paragraph A of the indictment alleged that Appellant:

 [D]id then and there unlawfully, intentionally, and knowingly cause the death
of an individual, namely: RICHARD BRACKNELL, by ligature
strangulation, while the said defendant was incarcerated in a Penal Institution,
to wit: THE EL PASO COUNTY DETENTION FACILITY, and the said
defendant murdered the said RICHARD BRACKNELL with intent to
establish, maintain or participate in a combination composed of said defendant,
and two or more other individuals, namely, ADAN ROMERO, EDDIE
CUMMINGS, JOE POMPA CASTILLO, ERIC GOMEZ, EFRAIN
ALVAREZ, OR EDDIE COMPEAN.


 We review a trial court's ruling on a motion to quash the indictment under an abuse
of discretion standard. Thomas v. State, 621 S.W.2d 158, 163 (Tex. Crim. App. 1980)(op.
on reh'g). A defect in the form of an indictment exists if the indictment fails to provide
adequate facts to give the defendant notice of the offense with which he is charged. Olurebi
v. State, 870 S.W.2d 58, 61-62 (Tex. Crim. App. 1994); see Tex. Code Crim. Proc. Ann.
art. 21.02(7) & 27.09(2) (Vernon 1989). When considering a motion to quash the indictment,
it is not sufficient to say the defendant knew with what offense he was charged; rather, the
question presented is whether the face of the indictment or charging instrument sets forth in
plain and intelligible language sufficient information to enable the accused to prepare his
defense. Lewis v. State, 659 S.W.2d 429, 431 (Tex. Crim. App. 1983); see Olurebi, 870
S.W.2d at 62. A charging instrument which tracks the language of a criminal statute
possesses sufficient specificity to provide a defendant with notice of a charged offense in
most circumstances. State v. Edmond, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996); Bynum
v. State, 767 S.W.2d 769, 778 (Tex. Crim. App. 1989). The indictment need not plead
evidence relied on by the State unless the facts sought are essential to give notice to the
defendant. Edmond, 933 S.W.2d at 129; Thomas, 621 S.W.2d at 161. Further, when a term
is defined in the statutes, it need not be further alleged in the indictment. Edmond, 933
S.W.2d at 129-30. Therefore, when a statute defines the manner or means of committing an
offense, an indictment based upon that statute need not allege anything beyond that
definition. Id. at 130.

 The State urges that a notice defect does not exist because the definition of
"combination" found in Chapter 71 of the Penal Code may be properly applied to Section
19.03(a)(5)(B). We agree.

 A comparison of the capital murder statute and the engaging in organized criminal
activity statute reveals that the term "combination" is used in an identical manner in the two
statutes. Section 19.03(a)(5)(B) provides that a person commits capital murder if, while
incarcerated in a penal institution, he murders a person as defined by Section 19.02(b)(1):

with the intent to establish, maintain, or participate in a combination or in the profits of a
combination. Tex. Pen. Code Ann. § 19.03(a)(5)(B) (Vernon Supp. 2004).

 Under Section 71.02, a person commits the offense of engaging in organized criminal
activity if:

 [W]ith intent to establish, maintain, or participate in a combination or in the
profits of a combination . . . he commits or conspires to commit one or more
of the following: [numerous listed offenses].


Tex. Pen. Code Ann. § 71.02(a) (Vernon Supp. 2004).

 Section 71.01(a) defines "combination" as follows:

 (a) "Combination" means three or more persons who collaborate in carrying
on criminal activities, although:

 (1) participants may not know each other's identity;

 (2) membership in the combination may change from time to time; and

 (3) participants may stand in a wholesaler-retailer or other arm's length
relationship in illicit distribution operations.


Tex. Pen. Code Ann. § 71.01(a) (Vernon 2003).

 As noted by the State, the statutory definition found in Section 71.01(a) was discussed
with the jury panel during voir dire and was included in the court's charge without any
objection by Appellant. Given that the term "combination" is used in the same manner in
both statutes, we conclude that it is appropriate to utilize Section 71.01(a)'s definition in
prosecutions under Section 19.03(a)(5)(B). Because the term is statutorily defined, the State
was not required to include further allegations regarding the term in the indictment. See
Edmond, 933 S.W.2d at 129-30; Thomas, 621 S.W.2d at 161. Issue Number Two is
overruled.

SUFFICIENCY OF THE EVIDENCE 


 In Issues Number Three and Four, Appellant challenges the legal and factual
sufficiency of the evidence to support his conviction under Paragraphs A and B of the
indictment.

Standards of Review


 In reviewing the legal sufficiency of the evidence to support a criminal conviction, we
must review all the evidence, both State and defense, in the light most favorable to the
verdict. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560,
573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991). The critical
inquiry is whether, after so viewing the evidence, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. McDuff v. State, 939 S.W.2d
607, 614 (Tex. Crim. App. 1997). This familiar standard gives full play to the responsibility
of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to
draw reasonable inferences from basic to ultimate facts. Jackson, 443 U.S. at 319, 99 S.Ct.
at 2789, 61 L.Ed.2d at 573. Our duty is not to reweigh the evidence from reading a cold
record but to act as a due process safeguard ensuring only the rationality of the fact finder. 
Williams v. State, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996). The verdict may not be
overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. Matson
v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The standard of review is the same
for both direct and circumstantial evidence cases. Geesa, 820 S.W.2d at 158.

 When conducting a factual sufficiency review, we consider all of the evidence, both
admissible and inadmissible, but we do not view it in the light most favorable to the verdict. 
Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex. App.--El Paso 1997, no pet.). We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare it with the
evidence that tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000); Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). A defendant
challenging the factual sufficiency of the evidence may allege that the evidence is so weak
as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered
contrary evidence, he may argue that the finding of guilt is against the great weight and
preponderance of the evidence. See Johnson, 23 S.W.3d at 11. Although we are authorized
to set aside the fact finder's determination under either of these two circumstances, our
review must employ appropriate deference and should not intrude upon the fact finder's role
as the sole judge of the weight and credibility given to any evidence presented at trial. Id.
at 7. We are not free to reweigh the evidence and set aside a verdict merely because we feel
that a different result is more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997); Clewis, 922 S.W.2d at 135.

Appellant's Conviction Under Paragraph A


 In order to sustain a conviction under paragraph A, the State was required to prove
that Appellant murdered Bracknell with intent to establish, maintain or participate in a
combination composed of Appellant, and two or more other individuals, namely, Adan
Romero, Eddie Cummings, Joe Pompa Castillo, Eric Gomez, Efrain Alvarez, or Eddie
Compean. Appellant contends that the evidence is legally and factually insufficient to prove
that he participated in any criminal activity other than the murder of Bracknell with the
individuals named in paragraph A of the indictment, and therefore, the evidence is
insufficient to prove a combination. Further, he argues the evidence is legally and factually
insufficient to prove that he committed Bracknell's murder with the intent to establish,
maintain, or participate in a combination.

 In Nguyen v. State, 1 S.W.3d 694 (Tex. Crim. App. 1999), the Court of Criminal
Appeals analyzed the definition of "combination" in the context of a challenge to the
sufficiency of the evidence to support a conviction for organized criminal activity. The Court
determined that the phrase "'collaborate in carrying on criminal activities'" implied
"continuity, --something more than a single, ad hoc effort." Id. at 697. It does not include
an agreement to jointly commit a single crime. Id. Therefore, to prove a combination, the
State must prove that the defendant intended to establish, maintain, or participate in a group
of three or more, in which the members intend to work together in a continuing course of 

criminal activities. Id. However, the acts which prove this element of the offense do not
necessarily have to be criminal offenses. Id.

 The facts in the instant case are distinguishable from Nguyen. The evidence showed
that Appellant murdered Bracknell with intent to establish, maintain or participate in a
combination with the named individuals. The evidence established that Appellant was a 
member of the Mexikanemi prison gang, or the Mexican Mafia as it is sometimes known. 
The purposes of the Mexican Mafia are to control the environment in the penal institution
where its members are located and generate money for its members, and the members
accomplish these goals through various criminal acts, including intimidation, violence, and
extortion. The Mexican Mafia also dispenses punishment to its own members for failure to
obey the organization's rules. Appellant had been in the cell block designated for the
Mexican Mafia, cell block 430, since it was created in 1994 and, as a lieutenant in the
Mexican Mafia, he was recognized as the cell block's leader or "tank boss." As the tank boss
and ranking member of the Mexican Mafia, Appellant determined the consequences for
members and non-members who did not follow the rules of the organization. Romero, as
sergeant, was the second in command and the other men named in the indictment, as well as
Bracknell, were "soldiers". The Mexican Mafia's written constitution provides evidence that
it is a criminal organization dedicated to engaging in "every other thing criminally
imaginable" on an ongoing basis. Additionally, the evidence at trial showed that the
members of the Mexican Mafia in cell block 430 had committed four assaults in the months
prior to Bracknell's murder. Appellant was shown to be involved in these assaults either
directly or as the ranking member of the Mexikanemi responsible for approving these actions
by members. Finally, the State offered evidence that Appellant and the other Mexikanemi
members named in the indictment murdered Appellant for violating the rules of the
organization by playing the radio too loud, taking more than his share of bread, and not
sharing extra food with other members. All of this evidence is legally sufficient to prove that
Appellant and the named individuals worked together in a continuing course of criminal
activities and Appellant murdered Bracknell with intent to establish, maintain, or participate
in the combination. See Hernandez v. State, 52 S.W.3d 268, 278 (Tex. App.--Corpus Christi
2001, no pet.)(evidence sufficient to prove combination where evidence established that
defendant was a member of a criminal street gang involved in drug trade, defendant ran a
crack house for a captain in the street gang, and the murder was in furtherance of gang
objectives). In our factual sufficiency review, we have considered all of the evidence,
including the testimony of former Mexikanemi acting general Elizondo, without viewing it
in the light most favorable to the verdict. Elizondo acknowledged that death is a possible
punishment for violation of the organization's rules but he testified that Bracknell's murder
was not an official hit or he would have known about it. The jury could have reasonably
rejected Elizondo's testimony in light of other evidence showing that Appellant killed
Bracknell for violating Mexikanemi rules in cell block 430, and therefore, the jury's
determination that the murder was committed in furtherance of the organization's objectives
is not against the great weight of the evidence. Likewise, the jury's finding that Appellant
and the individuals named in the indictment, as members of the Mexikanemi, engaged in a
continuing course of criminal activities is not so weak as to be clearly wrong and manifestly
unjust, nor is the finding against the great weight of the evidence. Therefore, we conclude
that the evidence is factually sufficient to support Appellant's conviction under Paragraph
A.

Appellant's Conviction Under Paragraph B


 Appellant next argues that the evidence is legally and factually insufficient to sustain
his conviction under Paragraph B because the State failed to prove that Appellant was
incarcerated for capital murder at the time of Bracknell's murder on December 12, 1994. 
Steven Elliott is the custodian of inmate records at the El Paso County Detention Facility.
Elliott testified before the jury that Appellant was originally arrested on July 22, 1993 on a
murder charge. Following Appellant's indictment for capital murder on August 10, 1993,
personnel in the detention facility's court coordinator section changed the jail's records to
reflect that Appellant was incarcerated for capital murder. The booking document reflected
the capital murder indictment number, the court, and the date of the change on the records,
August 10, 1993. Elliott did not know who had made the entries on the booking records but
he was certain that Appellant was incarcerated for capital murder on December 12, 1994. 
In a bill of exceptions, Elliott testified that some of the detention facility records did not
reflect the change made on the booking record. Sgt. James Nance also testified that
Appellant was being held for capital murder on December 12, 1994. 

 In his brief, Appellant relies on evidence presented in connection with a motion to
quash paragraph B filed and presented on the date trial commenced, January 8, 2001. In
reviewing the sufficiency of the evidence, however, we do not consider testimony presented
in a hearing outside of the jury's presence. To the extent Appellant argues that the trial court
erred in denying this motion to quash, his contention is waived because he failed to object
prior to the date on which the trial on the merits commenced. See Tex. Code Crim. Proc.
Ann. art. 1.14(b) (Vernon Supp. 2004) (providing that defendant waives complaint about
defect, error, or irregularity of form or substance in an indictment if he fails to object before
the date on which the trial on the merits commences).

 We conclude that the evidence is legally sufficient to permit a jury to conclude beyond
a reasonable doubt that Appellant was incarcerated for capital murder at the time of
Bracknell's murder. While Appellant offered some evidence that not all records had been
modified to reflect the change from murder to capital murder, the jury was free to weigh the
evidence and resolve conflicts in the evidence. The jury's resolution of the issue is not
clearly wrong and manifestly unjust nor is it contrary to the great weight of the evidence. 
Accordingly, we find the evidence to be factually sufficient to support the jury's
determination that Appellant was incarcerated for capital murder at the time of Bracknell's
murder. Issue Number Three is overruled.

EXCLUSION OF EVIDENCE


 In Issue Number Four, Appellant complains that the trial court excluded a videotape
and four photographs taken in cell block 430 offered to show the view available to Ruben
Cazares at the time of Bracknell's murder. Outside the presence of the jury, Appellant
offered into evidence a videotape (Dx24) and four photographs (Dx8, Dx9, Dx10, and Dx11)
made in cell block 430 between 4 a.m. and 6 a.m. on December 12, 1999 depicting the view
from cell 7 where the witness Cazares was located into cell 4 where the murder occurred. 
The State objected to all five exhibits on the ground that it did "not accurately depict what
the human eye can see in cell block 430 looking from cell number 7 to cell number 4." The
trial court agreed with the State's contention and sustained the objection, noting that ". . . 
I don't think it accurately reflects what the human eye can see, having been there myself . ..
last night." The trial court had visited the jail the previous evening in connection with the
State's request for a jury view of cell block 430 in order to demonstrate what Cazares could
or could not see from cell number 7. Appellant, however, had objected to the jury view on
the ground that there was insufficient evidence to duplicate lighting conditions in the cell
block and the trial court sustained that objection. When the prosecutor urged the court to
reconsider its ruling on the jury view, the court indicated that it would reconsider the ruling
and noted that the defense exhibits might become relevant if the jury viewed the cell block. 
In a bill of exceptions, Appellant's investigator, Sam Streep, testified that the videotape and
photographs fairly and accurately represented the scene at approximately 5 a.m. on December
12, 1999. He added that the photographs were a fair and accurate representation of what he
was able to see with the human eye. 

 The trial court has wide discretion in determining the admissibility of evidence. 
Montgomery v. State, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). Therefore, we review
the trial court's decision to exclude evidence under an abuse of discretion standard. Allridge
v. State, 850 S.W.2d 471, 492 (Tex. Crim. App. 1992). A trial court abuses its discretion
when its decision was so clearly wrong as to lie outside that zone within which reasonable
persons might disagree. Cantu v. State, 842 S.W.2d 667, 682 (Tex. Crim. App. 1991);
Montgomery, 810 S.W.2d at 391 (op. on reh'g).

 Generally, the results of an out-of-court experiment are admissible in the discretion
of the trial court if the experiment was made under similar conditions to the event to which
the results of the experiment relate. Esquivel v. State, 595 S.W.2d 516, 529 (Tex. Crim. App.
1980). To be admissible, an experiment need not be made under identical conditions of the
event. Ginther v. State, 672 S.W.2d 475, 476 (Tex. Crim. App. 1984). Dissimilarities go to
the weight of the evidence, not to the admissibility. Id. The trial court must make a
determination, however, of whether the conditions under which the experiment was made are
similar, or approximately similar, to those which surround the duplicated event. Id. 

 Appellant argues that the videotape and photographs were made under identical
conditions as existed in cell block 430 on the morning of December 12, 1994. Appellant's
argument misses the point, however, of the State's objection and the trial court's ruling. The
trial judge determined, based upon his personal observation of cell block 430, that the
videotape and photographs did not accurately depict what the human eye could see. Even
assuming that the videotape and photographs were made under the same or similar lighting
conditions, those conditions were not accurately depicted by the five exhibits. The trial court
did not abuse its discretion by excluding the videotape and photographs. Issue Number Four
is overruled.

ADMISSION OF WITNESSES' STATEMENTS


 In Issue Number Five, Appellant asserts that the trial court erred by admitting the
written statements Jose Salcedo and Ruben Cazares pursuant to Tex. R. Evid. 801(e)(1)(B)
because it had the effect of "bolstering" their testimony. As detailed in the factual summary,
Salcedo and Cazares testified on behalf of the State. Cazares had said in his original written
statement dated December 13, 1994 that he had been asleep at the time of Bracknell's murder
and had not heard or seen anything. On December 15, 1994, Cazares gave a second written
statement regarding Bracknell's murder and the threats Appellant had made against him and
his family. At trial, both witnesses testified on direct and during cross-examination about the
favorable treatment they had been shown by the State. Among other things, Salcedo had not
been arrested on a warrant issued in Louisiana and Cazares had reached an agreement with
the State that a pending motion to revoke would be dismissed and his probation would be
terminated early. Appellant directly impeached the credibility of both witnesses by pointing
out not only inconsistencies but also instances on which they had lied. For example, Cazares
also admitted on cross-examination that he had lied to jail officials in order to get into cell
block 430 by claiming to be Cumming's cousin and he had lied in his first statement made
to Detective Vega. 

 Following Salcedo and Cazares' testimony, the State recalled Detective Vega for the
purpose of offering portions of the written statements given to her by Salcedo and Cazares
on December 15, 1994. Citing Rule 801(e)(1)(B) of the Texas Rules of Evidence, the State
offered the portions of the witnesses' written statements which were consistent with their
trial testimony in order to rebut a claim of recent fabrication or improper influence or motive.
The trial court overruled Appellant's objections and admitted the redacted statements under
Rule 801(e)(1)(B). At Appellant's request, the trial court included some of the redacted
statements under Tex. R. Evid. 106. 

 Rule 613(c) provides that a prior statement of a witness which is consistent with the
testimony of the witness is inadmissible except as provided in Rule 801(e)(1)(B). Tex. R.
Evid. 613(c). Rule 801(e)(1)(B) provides that a statement is not hearsay if the declarant
testifies at the trial or hearing and is subject to cross-examination concerning the statement,
and the statement is consistent with the declarant's testimony and is offered to rebut an
express or implied charge against the declarant of recent fabrication or improper influence
or motive. Under this rule, the prior consistent statement of a witness is admissible to rebut
an express or implied charge of recent fabrication or improper influence or motive if the
statement was made before the motive to fabricate arose. Dowthitt v. State, 931 S.W.2d 244,
263 (Tex. Crim. App. 1996). A reviewing court will not disturb a trial court's ruling on the
admissibility of evidence absent an abuse of discretion. Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997); Bolden v. State, 967 S.W.2d 895, 898 (Tex. App.--Fort Worth 1998,
pet. ref'd).

 In his brief, Appellant concedes he impliedly charged that Salcedo and Cazares had
received substantial benefits from the State in exchange for their testimony and that some of
their testimony was inaccurate or simply untrue. However, he maintains that Rule
801(e)(1)(B) does not allow the admission of the redacted statements of the witnesses
because they improperly "bolstered" the witnesses' testimony. Citing Sledge v. State, 686
S.W.2d 127 (Tex. Crim. App. 1984), he argues that the trial court erred by admitting those
portions of the witnesses' statements relating to their unimpeached testimony because it had
the effect of bolstering the witnesses. In Sledge, an aggravated robbery prosecution, the
defendant impeached the complainant's in-court identification by focusing on a prior
inconsistent statement regarding the robber's clothing. Seeking to rehabilitate the
complainant's identification, the State called the complainant's granddaughter who testified
that the complainant had identified the defendant as the robber when police brought him to
the scene. A police officer testified to the same fact. The Court of Criminal Appeals held
that admission of the granddaughter's and police officer's testimony improperly bolstered
the complainant's testimony and constituted rehabilitative "overkill." Sledge, 686 S.W.2d
at 131. 

 The precedential value of Sledge has been undercut by subsequent developments. 
First, it must be noted that Sledge was decided prior to the adoption of the Rules of Criminal
Evidence (now the Rules of Evidence). The admission or exclusion of evidence now must
be analyzed under the Rules of Evidence. Second, the Court of Criminal Appeals has
modified the definition of "bolstering" used in Sledge. In Sledge, the Court stated: 

 "Bolstering" occurs when one item of evidence is improperly used by a party
to add credence or weight to some earlier unimpeached piece of evidence
offered by the same party. Id. at 129. 


Following the adoption of the Rules of Criminal Evidence, the Court of Criminal Appeals
refined its definition of "bolstering":

 "Bolstering" may perhaps be understood a little more precisely to be any
evidence the sole purpose of which is to convince the factfinder that a
particular witness or source of evidence is worthy of credit, without
substantively contributing to make the existence of a fact that is of
consequence to the determination of the action more or less probable than it
would be without the evidence. 


Cohn v. State, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993); see also Cohn, 849 S.W.2d at
821 (J. Campbell, concurring opinion)(calling into question whether "bolstering" is a valid
objection after adoption of the Rules of Criminal Evidence). Given that Sledge was decided
prior to the adoption of the former Rules of Criminal Evidence, including Rule 801(e)(1)(B),
and its definition of "bolstering" is no longer valid, we find its holding inapplicable to the
issue before us. See Solomon v. State, 854 S.W.2d 265, 269 (Tex. App.--Fort Worth 1993,
no pet.)(analyzing admission of evidence under Rule 801(e)(1)(B) and calling into doubt the
applicability of Sledge to the issue). 

 The trial court painstakingly reviewed the written statements of Salcedo and Cazares
and admitted only those portions of their statements which were consistent with their
testimony. Under Rule 801(e)(1)(B), the prior consistent statements are admissible to rebut
the charge made by Appellant that the witnesses' testimony were motivated or improperly
influenced by the favorable treatment provided them by the State. Consequently, the trial
court did not abuse its discretion by admitting the redacted statements. Issue Number Five
is overruled.

DISJUNCTIVE SUBMISSION


 In his final issue, Appellant asserts that the trial court erred by rejecting his request
that the court instruct the jury that they had to reach a unanimous verdict on Paragraph A or
Paragraph B or both paragraphs before the jury could return a guilty verdict. The court
submitted Paragraphs A and B in a disjunctive application paragraph and provided a general
verdict form which allowed the jury to find Appellant guilty of capital murder if they found
beyond a reasonable doubt that he committed the offense of capital murder as alleged in
either Paragraph A or Paragraph B of the indictment. The jury signed the general verdict
form indicating that they found Appellant guilty of capital murder under the disjunctive
submission. 

 It is well established that alternate pleading of the differing methods of committing
one offense may be charged in one indictment. Kitchens v. State, 823 S.W.2d 256, 258 (Tex.
Crim. App. 1991). And although the indictment may allege the differing methods of
committing the offense in the conjunctive, it is proper for the jury to be charged in the
disjunctive. Id. Further, it is appropriate where the alternate theories of committing the same
offense are submitted to the jury in the disjunctive for the jury to return a general verdict if
the evidence is sufficient to support a finding under any of the theories submitted. Id. As
noted in Kitchens, the Supreme Court has determined that "there is no general requirement
that the jury reach agreement on the preliminary factual issues which underlie the verdict." 
Kitchens, 823 S.W.2d at 258, (quoting Schad v. Arizona, 501 U.S. 624, 632, 111 S.Ct. 2491,
2497, 115 L.Ed.2d 555 (1991)). 

 In Kitchens, the indictment alleged two alternate means of committing capital murder,
namely, that Kitchens committed murder in the course of aggravated sexual assault and
murder in the course of robbery. The court submitted these alternate means of committing
capital murder in the disjunctive and provided a general verdict form. Kitchens complained
that the verdict would not be unanimous because some jurors could have found him guilty
of murder in the course of aggravated sexual assault and others could have found him guilty
of murder in the course of robbery. The Court of Criminal Appeals rejected Kitchens'
argument because these are alternate methods of committing capital murder.

 Appellant acknowledges the rule in Kitchens, but argues, without much explication
in his original brief, that it should not apply here because the aggravating circumstances
pertaining to these two alternate methods of committing capital murder are so different as to
require a different rule. Appellant cites no authority in support of this argument. In his reply
brief, however, Appellant cites Schad v. Arizona and argues, in effect, that Paragraphs A and
B are not really alternate methods of committing the same offense but are, in fact, separate
offenses requiring separate verdicts.

 In Schad, the defendant was charged with first-degree murder under alternate theories
of premeditated murder and felony-murder (murder committed in the course of robbery). On
appeal, Schad argued that his conviction under instructions that did not require the jury to
agree on one of the alternative theories of premeditated and felony murder is
unconstitutional. Schad, 501 U.S. at 630, 111 S.Ct. at 2496. A plurality of the Supreme
Court rejected Schad's argument, holding that there is no constitutional requirement that the
jury agree on a single means of committing an offense. Schad, 501 U.S. at 631, 111 S.Ct.
at 2497. The Court noted, however, that there is a point at which the alternative means of
committing a crime are so distinct as to constitute separate offenses. Schad, 501 U.S. at 633-34, 111 S.Ct. at 2498. The plurality rejected as too indeterminate the "distinct conceptual
groupings" approach derived from the Fifth Circuit's opinion in United States v. Gipson, 553
F.2d 453 (5th Cir. 1977). Schad, 501 U.S. at 633-34, 111 S.Ct. at 2498. Declining to create
a bright-line test, the plurality determined that the issue would be resolved by analyzing how
offenses have been defined historically and in wide practice. Schad, 501 U.S. at 638, 111
S.Ct. at 2500. The Court observed that the state legislature's definition of the elements of
the offense is usually dispositive. Schad, 501 U.S. at 639, 111 S.Ct. at 2501. 


 The Texas Legislature has historically defined capital murder as murder plus an
aggravating factor. Appellant has not cited any authority in support of his argument that
these are separate offenses. We are not persuaded that these two means of committing
capital murder are so distinct as to constitute separate offenses. See Fitts v. State, 982
S.W.2d 175, 179 (Tex. App.--Houston [1st Dist.] 1998, pet. ref'd)(finding that capital murder
in the course of committing arson and capital murder for remuneration were alternative
methods of committing the same offense). Therefore, the trial court did not err by submitting
Paragraphs A and B in the disjunctive with a general verdict form. Issue Number Six is
overruled. Having overruled all six issues raised on appeal, we affirm the judgment of the
trial court.

September 15, 2004 

 


 PER CURIAM

 


Before Panel No. 5

Preslar, C.J. (Ret.), Larsen, and Chew, J.J.

Preslar, C.J. (Ret.) sitting by assignment


(Do Not Publish)
1. Tex. Pen. Code Ann. § 19.03(a)(5)(B) (Vernon Supp. 2004).
2. Tex. Pen. Code Ann. § 19.03(a)(6)(A) (Vernon Supp. 2004).
3. See The State of Texas v. Adan Romero, 08-98-00101-CR (Tex. App.--El Paso August 17, 1999, pet.
ref'd)(not designated for publication).
4. Questions about the facial constitutionality of a statute upon which a defendant's conviction is based
should be addressed even when such issues are raised for the first time on appeal. See Holberg v. State, 38 S.W.3d
137, 139 n.7 (Tex. Crim. App. 2000); Rabb v. State, 730 S.W.2d 751, 752 (Tex. Crim. App. 1987). Appellant,
however, insists in his reply brief that he "has not argued that Section 19.03(a)(6)(A) is facially unconstitutional, but
rather, that is it unconstitutional as applied to this Appellant." (Emphasis in original).